# SUPPLEMENT.

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

The requirement of the Constitution that representatives "shall be chosen by written vote" may be complied with in voting by a machine which registers each vote cast without the use of separate ballots, and the provisions for sorting and counting the votes for governor and for senators do not prevent the use of machines in voting and in counting the votes cast. HOLMES, C. J., KNOWLTON, & LATHROP, JJ.   LORING, J., *concurring*, provided the result of the action of the machine in registering each vote cast is visible to the voter, and the work of the machine in adding up the votes is done under the supervision of some person duly charged with the duty of counting the votes cast.   MORTON, BARKER, & HAMMOND, JJ., *dissenting*, on the ground, that the turn of a wheel or dial punching a hole in an unseen roll of paper on which are the names of candidates, by a voter who pulls a lever or turns a key, is not the use of a written vote within the meaning of the Constitution; nor is the inspection of a dial, even if preceded or followed by an inspection of all the cogs and mechanism which have moved the hands of the dial, or the counting of holes in such a paper and the inspection of the machinery which made the holes, the sorting and counting of votes by election officers.

THE following order was passed by the House of Representatives on March 29, 1901, and on April 1 transmitted by the Speaker to the Justices of the Supreme Judicial Court. On April 25 the Justices returned the answer which is subjoined.

Ordered, That the opinion of the Justices of the Supreme Judicial Court be required by the House of Representatives upon the following important question of law:

Has the General Court the right to authorize the use of voting and counting machines at elections by the people of national, state, district, county, city or town officers?

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court having considered the question proposed by the Honorable House

of Representatives, by its order of March 29, 1901, a copy of which is annexed, respectfully submit the following opinion.

The ground for doubt as to the power of the General Court under the Constitution of the Commonwealth' is to be found in the requirement that representatives " shall be chosen by written votes," Part 2, c. 1, § 3, art. 3, and in the implication of the provision for sorting and counting the votes for governor, c. 2, § 1, art. 3, and for senator, c. 1, § 2, art. 2. To these may be added the requirement that certain militia officers shall be elected by written vote, c. 2, § 1, art. 10, and articles 16 and 17 of the Amendments, one or both of which might be held to adopt the method of voting for governor for the election of certain other officers. Whether the first mentioned requirement, as to representation, has been repealed by art. 21 of the Amendments, giving the Legislature power to prescribe the " manner of ascertaining " the election of representatives, it is unnecessary to consider, although it may be well to bear that Amendment in mind in weighing the arguments which we shall adduce. Apart from these provisions, no doubt, the general power of the Legislature would extend to authorizing the use of a voting machine. See for example Amendments, art. 19.

With regard to votes for representatives in Congress it is provided by c. 154 of the Statutes of the United States for 1899, that they may be by " voting machine the use of which has been duly authorized by the State law," so that the elections of national officers require no separate consideration.

We assume that the voting machines which the Honorable House has in mind vary in their mode of recording votes, that all of them dispense with the use of a separate piece of paper for each vote, that some of them register a large number of successive votes by successive punches upon one strip of paper, in separate lines for separate candidates, with the names, if necessary, against the lines, and that some of them abandon the use of paper altogether in recording, each vote being marked by the partial revolution of a cog-wheel or other similar device, and the total number being shown by some easily adapted index. If necessary, however, in this class of machines the names of the candidates may appear in writing attached to the point where the voter registers his vote, in such manner as to indicate that

his turning a particular key or pressing a particular knob expresses a vote for the name written above.

The question whether such a machine satisfies whatever requirements or implications there may be in the Constitution of the Commonwealth, depends upon how far we are to follow the line of argument started by Chief Justice Parker in *Henshaw* v. *Foster*, 9 Pick. 312. In that case it was pointed out, with regard to this very matter, that, as the Chief Justice puts it, " words competent to the then existing state of the community, and at the same time capable of being expanded to embrace more extensive relations, should not be restrained to their more obvious and immediate sense, if, consistently with the general object of the authors and the true principles of the compact, they can be extended to other relations and circumstances which an improved state of society may produce." (p. 317.)

To state in our own way the mode of approaching the question, it is not so important to consider what picture the framers of the Constitution had in their minds, as what benefits they sought to secure, or evils to prevent, — what they were thinking against in their affirmative requirement of writing, and what they would have prohibited if they had put the clause in a negative form. The answer, or a part of it, is given by Chief Justice Parker in the case already cited : " The practice had been to elect many town officers by hand vote, and probably in some instances representatives had been so chosen. It became necessary therefore to prescribe that the choice should be made by ballot ; but even the word *ballot* itself is ambiguous, and therefore it was required that representatives shall be elected *by written votes.*" No doubt the picture in the minds of those who used the words was that of a piece of paper with the names of the candidates voted for written upon it in manuscript, but the thing which they meant to stop was oral or hand voting, and the benefits which they meant to secure were the greater certainty and permanence of a material record of each voter's act and the relative privacy incident to doing that act in silence. They did not require the signature of the voter, or any means of identifying his vote as his after it had been cast. It was settled by *Henshaw* v. *Foster* that they did not require manuscript. In our opinion they did not require a separate piece of paper for each voter.

That is to say, by requiring writing they did not prevent the Legislature from authorizing several voters to use a single ballot if the voters all signed it, or in some way sufficiently indicated that a single paper expressed the act and choice of each. It seems to us that the object and even the words of the Constitution in requiring " written votes " are satisfied when the voter makes a change in a material object, for instance, by causing a wheel to revolve a fixed distance, if the material object changed is so connected with or related to a written or printed name purporting to be the name of a candidate for office, that, by the understanding of all, the making of the change expresses a vote for the candidate whose name is thus connected with the device.

So far we have been considering the requirement of written votes alone, and have assumed that all other constitutional conditions are complied with. But it remains to consider whether the result is changed by the provisions as to sorting and counting votes where those provisions apply. These seem to us to raise less difficulty. The provisions do not express a constitutional end ; they express merely assumptions that sorting and counting will be necessary if you have written votes, as they would have been necessary a hundred years ago. It would not be true to say that the framers of the Constitution chose the risk of errors incident to sorting and counting in preference to the risk of errors of a different class incident to some different way of finding out the result. . They never thought of any other way. Probably the only distinctions which occurred to them concerned different modes of sorting and counting.

It is theoretically possible to exclude by a mechanical device every chance of error in the sorting and counting of votes. Whether that is accomplished by existing machines is a matter about which we have no adequate information, and is a question of fact which it would not fall within our province to determine. We assume that the Legislature before authorizing the use of a machine would satisfy itself that the voter would be sufficiently apprised of what to do in order to vote for his candidate, that the machine really would carry out and express the intent which it purported to be ready to express, that it was of such mechanical perfection as to exclude the possibility of internal error, and that sufficient arrangements were made to prevent external

fraud. Under such circumstances, the sorting and counting of the votes shrink by atrophy to a mere survival, but there is nothing contrary to the Constitution in that. If it be deemed technically necessary that the possibility at least of sorting and counting should remain, it does remain. Whether in the form of successive punches in a line upon paper, or in the marked revolutions of a wheel appropriated to a given candidate, material changes abide which signify by predetermined language the number of votes cast, exactly to the same extent that it would be signified by slips of paper bearing characters in printer's ink. The votes could be counted as cast, if it were necessary. They can be counted afterwards as well. The fact that the index of machinery has cut down the chance of personal error to a minimum surely is not an objection sanctioned by the Constitution.

The views which we express coincide with the opinion of a majority of the judges of the Supreme Court of Rhode Island in regard to the McTammany machine, *In re Voting Machine*, 19 R. I. 729, and with some other discussion of the subject which we have seen.

It is proper to add that we have considered only the answer to the general question. What provisions should be made in the exceptional case of challenged votes, etc., is a question of detail, easily dealt with by special arrangements.

OLIVER WENDELL HOLMES.
MARCUS P. KNOWLTON.
JOHN LATHROP.

I agree with this conclusion, provided the result of the action of the machine in registering each vote cast is visible to the voter casting the vote, and the work of the machine, in adding up the votes cast, is done under the supervision of some person duly charged with the duty of counting the votes cast.

I agree that machinery can be used by the voter in making a written vote within the meaning of the Constitution, and also that there is nothing in the Constitution which forbids machinery being used in counting the votes cast.

The first difficulty, in holding that the provisions of the Constitution are complied with by any one of the several voting machines which are now in use (so far as I know), comes from

the fact that in none of them can the voter see what his written vote is. In the method of voting prescribed by the Constitution, the voter knows what the written vote cast by him is. It is manifest, that the use of a voting machine, which records a written vote without disclosing to the voter what that vote is, involves chances of error quite different from those involved in the method of voting contemplated by the Constitution. There are similar difficulties arising from the fact, that the addition of the several votes cast made by many of the voting machines, is also invisible, and that the correctness of the result produced by the machine depends entirely upon the machine's having made the addition correctly in the first instance, without the possibility of knowing whether that addition was or was not correctly made, and without the possibility of correcting it, if it was not correctly made. And again, the only guard against a voter's casting more than one vote lies in the fact, that the mechanical device, put into the machine to prevent double voting, has worked correctly, and in that fact alone, without there being any means of knowing whether it did, or did not, work correctly, and without the possibility of correcting such an error if one were committed.

It is manifest that in the matter of the record made by the machine being in each instance what the voter intended his vote should be, in the matter of the several votes cast being correctly added together by the machine, and in the matter of double voting, the chances of error involved, where the result of an election is made to depend wholly upon the result produced by the voting machine, are quite different from those incident to the method of voting contemplated by the Constitution, at least so far as the voting machines now in use are concerned. And, in my opinion, the chances of error to which I have referred are so far different, as to forbid votes cast and counted only by such a machine, being held to be a compliance with the provisions of the Constitution in that connection.

It is evident that the use of voting machines which I have suggested would destroy to a great extent the secrecy of the ballot; but I find nothing in the Constitution requiring that the written vote there provided for.should be a secret one.

It has been suggested that a machine could be devised, which would indicate that a vote had been cast for some person for a

designated office, without disclosing the person voted for; and that by the use of such a machine the secrecy of the ballot could be maintained and the requirements of the Constitution met. In my opinion, the use of such a machine would not meet the requirements of the Constitution.

WILLIAM CALEB LORING.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit the following, as their opinion upon the question of law stated in your order of March 29, 1901, which question is:

"Has the General Court the right to authorize the use of voting and counting machines at elections by the people of national, state, district, county, city or town officers?"

*First.* As to county, city and town officers, and as to officers chosen by districts, other than councillors, senators and representatives, we know of no constitutional restriction upon the power of the General Court to direct the manner of choice.

*Second.* As to councillors, senators and representatives, and as to the governor, lieutenant governor, secretary, treasurer and receiver general, auditor and attorney general, there are constitutional provisions which must be considered in answering your question.

The provisions to which we refer are these:

Declaration of Rights, art. 9. "All elections ought to be free. . . ."

Part 2, c. 1, § 1, art. 4. "And further, full power and authority are hereby given and granted to the said General Court, from time to time to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this Constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same, and for the necessary support and defence of the government thereof; and to name

and *settle* annually, or provide by fixed laws, for the naming and settling all civil officers within the said Commonwealth ; the election and constitution of whom are not . . . otherwise provided for. . . ."

Chapter 1, § 2, art. 2. " The senate shall be the first branch of the legislature; and the senators shall be chosen in the following manner, viz. . . . The selectmen of the several towns . . . shall receive the votes of all the inhabitants of such towns . . . and shall sort and count them in open town meeting, and in presence of the town clerk, who shall make a fair record, in presence of the selectmen, and in open town meeting, of the name of every person voted for, and of the number of votes against his name ; and a fair copy of this record shall be attested by the selectmen and the town clerk, and shall be sealed up, directed to the Secretary of the Commonwealth for the time being, with a superscription, expressing the purport of the contents thereof, and delivered by the town clerk of such towns, to the sheriff of the county in which such town lies. . . ."

Chapter 1, § 3, art. 3. " Every member of the house of representatives shall be chosen by written votes."

Chapter 2, § 1, art. 3. " Those persons . . . qualified . . . within the several towns of this Commonwealth, shall, at a meeting to be called for that purpose, . . . annually, give in their votes for a governor, to the selectmen, who shall preside at such meetings ; and the town clerk, in the presence and with the assistance of the selectmen, shall, in open town meeting, sort and count the votes, and form a list of the persons voted for, with the number of votes for each person against his name ; and shall make a fair record of the same in the town books, and a public declaration thereof in the said meeting; and shall, in the presence of the inhabitants, seal up copies of the said list, attested by him and the selectmen, and transmit the same to the sheriff of the county. . . ."

Chapter 2, § 1, art. 10. " The captains and subalterns of the militia, shall be elected by the written votes of the train band and alarm list of their respective companies ; the field officers of regiments shall be elected by the written votes of the captains and subalterns of their respective regiments ; the brigadiers shall be elected, in like manner, by the field officers of their respective brigades. . . ."

Chapter 2, § 2, art. 1. "There shall be annually elected a lieutenant governor . . . in the same manner with the governor. . . ."

Amendments, art. 16. "Eight councillors shall be annually chosen by the inhabitants of this commonwealth, qualified to vote for governor. The election of councillors shall be determined by the same rule that is required in the election of governor. . . . The day and manner of the election, the return of the votes, and the declaration of the said elections, shall be the same as are required in the election of governor. . . ."

Art. 17. "The secretary, treasurer and receiver-general, auditor, and attorney-general, shall be chosen annually. . . . The qualification of the voters, the manner of the election, the return of the votes, and the declaration of the election, shall be such as are required in the election of governor. . . ."

Art. 21. ". . . The manner of calling and conducting the meetings for the choice of representatives, and of ascertaining their election, shall be prescribed by law. . . ."

Art. 22. ". . . Each district shall elect one senator. . . ."

Art. 24. "Any vacancy in the senate shall be filled by election by the people of the unrepresented district, upon the order of a majority of the senators elected."

In our opinion, the requirements as to the choice of senators found in Part 2, c. 1, § 2, art. 3, of the Constitution, were not abrogated by articles 22 and 24 of the Amendments, nor was the provision of Part 2, c. 1, § 3, art. 3, that "Every member of the house of representatives shall be chosen by written votes," abrogated by art. 21 of the Amendments.

The provision that representatives shall be chosen by written votes was before this court in the year 1830, in the case of *Henshaw* v. *Foster*, 9 Pick. 312, in which decision it was held that printed votes are written votes within the meaning of the provision.

The same decision states the general considerations which should have weight in construing the provision, and with that statement we agree: "In construing so important an instrument as a constitution, especially those parts which affect the vital principle of a republican government, the elective franchise, or the manner of exercising it, we are not, on the one hand, to in-

dulge ingenious speculations, which may lead us wide from the true sense and spirit of the instrument; nor on the other, to apply to it such narrow and constrained views as may exclude the real object and intent of those who framed it. We are to suppose that the authors of such an instrument had a thorough knowledge of the force and extent of the words they employ, that they had a beneficial end and purpose in view, and that more especially in any apparent restriction upon the mode of exercising the right of suffrage, there was some existing or anticipated evil which it was their purpose to avoid.

" If an enlarged sense of any particular form of expression should be necessary to accomplish so great an object as the convenient exercise of the fundamental privilege or right, that of election, such sense must be attributed. We are to suppose that those who were delegated to the great business of distributing the powers which emanated from the sovereignty of the people, and to the establishment of rules for the perpetual security of the rights of person and property, had the wisdom to adapt their language to future as well as existing emergencies; so that words competent to the then existing state of the community, and at the same time capable of being expanded to embrace more extensive relations, should not be restrained to their more obvious and immediate sense, if, consistently with the general object of the authors and the true principles of the compact, they can be extended to other relations and circumstances which an improved state of society may produce."

The decision from which we have quoted applied these principles; and because printing was, in law, writing from a time before that when the Constitution was made, and because the use of printed votes was equally well calculated to avoid the evils which the framers of that instrument thought would attend elections if conducted by nomination and hand vote, or *viva voce*, the court held that printed votes were constitutional, although the uniform practice had been, for some fifty years, to use manuscript votes only.

The same decision says further: " This requisition of written votes in the constitution is confined to the choice of representatives. The important election of governor, senators and counsellors, is left unprovided for in this respect, except by implication,

and that implication does not exclude printed votes. The votes of all the different communities were to be sorted and counted, and a certificate of the result transmitted to a common focus, the secretary's office, where they were to be examined and compared. This process *necessarily* requires tickets or ballots, so that there was no occasion to require expressly that the votes should be in writing or in print. There can be no ground to exclude printed votes for these state officers, for all that is required is that they should be so given as that they may be sorted and counted."

Bearing in mind the statement of the Declaration of Rights that "All elections ought to be free," and also the general rules laid down in the case of *Henshaw* v. *Foster*, we have examined the published laws under which, during our colonial and provincial periods and the interval between the Declaration of Independence and the inauguration of our present government, officers have been chosen or appointed. Without giving the citations, it is enough to say that such an examination shows that while higher officers often were chosen by the casting of separate paper votes by the individual voters, some elections were made by the use of Indian corn and beans, as ballots, and that as to much the greater number of officers chosen by the people there was no specific direction as to the manner in which the choice of the individual voter should be expressed ; but representatives to the General Court were selected by the voters in town, district or plantation meetings, the votes being given under statutory directions as to the manner of voting, contained in Prov. St. 1693-4, c. 14, §§ 2, 6, 7 ; 1 Prov. Laws, (State ed.) 147. These directions provide that no voter shall put in more than one vote for any one person, and that "All persons shall put in their votes, unfolded, to the selectmen or constables appointed to receive the same." These provisions plainly imply that the only legal method of voting for representatives under the provincial government was for each voter to put in his own separate written vote. An examination of the printed records of the town of Boston shows that this was the method there used up to 1780, and the only reason we have found for supposing that representatives to the General Court of the Province ever were chosen by nomination and hand vote, or *viva voce*, is

the statement in the decision in *Henshaw* v. *Foster*, at page 319, that "probably in some instances representatives had been so chosen."

In most elections the votes given in at town meeting were not preserved after the declaration of the result in open meeting. But in the case of the nomination of magistrates or assistants under the Massachusetts Bay Colony charter, the votes cast in the meetings were there sealed up and then carried to the shire towns, and from each shire town to Boston, where they were finally opened, and the result of the voting in the towns and plantations ascertained. And in the case of county treasurers and registers of deeds under the provincial government, the votes given in by the individual voters at the town meetings were thus sealed up, and taken to the Court of Sessions of the county, and opened and sorted in the presence of the justices by men appointed by them for the purpose, and the result thus ascertained in that court.

Interpreting the Constitution in the light of the circumstances existing at the time of its adoption, as well as of the laws and customs which had theretofore prevailed, we think that the language prescribing the way in which the will of the voters shall be expressed and ascertained in the case of the election of governor and of the other State officers, where similar language is used, necessarily implies at least that the choice of the voter shall be indicated by some kind of writing upon a paper or other material thing, that this material thing bearing this written expression of the choice of the voter shall by his act of voting pass from his possession and control into that of the officers charged with the duty of conducting the election, and that the voter shall have reasonable opportunity to see that it has so passed, that it shall be distinct from that handed in by any other voter, and that these written votes so handed in shall continue to be the same material things capable of being handled, sorted and counted, and that the whole work of ascertaining and declaring the result shall be the personal act of these election officers, with the written votes before them, the sorting and counting as well as the declaration of the result being done by sworn officers. One reason for the requirement of a written vote is that the voter may have a reasonable opportunity of making his

choice without immediate influence upon the part of others; and the reason for the requirements applicable to the sorting and counting is that the votes may not fail of their proper force by reason of mistake or fraud in the count. The safeguard erected by the Constitution is that there shall remain after the closing of the voting, in a material form, capable of being read and understood by men, a written vote cast by each voter; and that all these individual votes, each given by the voter to the election officers, shall be read, sorted, and counted in accordance with the several tenor of each, by men acting under the sanction and obligation of their respective official oaths.

So far as we have been informed as to the nature of the machines mentioned in your order, none of them provides for or allows the individual voter to have in his own hands a paper or other material thing bearing upon itself the expression of his choice; none of them allows him to cast or deposit in the custody of the election officers a paper or other material thing bearing such expression as his individual written vote; and none of them, upon the casting of the vote, or at the closing of the polls, places in the hands of the election officers a separate material thing given in by the voter, which the officers can handle, sort and count. None of them is so built or worked that the voter can know, that, unless sworn officers err or are false to their oaths, the choice which the Constitution commands him to express by "written vote," will be counted, and counted as he cast it. Yet to give him that certainty, and to give the State the safeguard which comes from his having that certainty, is one purpose of the constitutional requirement of "written votes," "sorted and counted" in open meetings, so that each vote must have its legitimate weight in the election, unless an intelligent and responsible man fails in the performance of a simple, sworn duty.

The turn of a wheel or a dial, the punching of a hole in an unseen roll of paper on which are the names of candidates, by a voter who pulls a lever or turns a key, is not the use of a written vote within the meaning of the Constitution; nor is the inspection of a dial, even if preceded or followed by an inspection of all the cogs and mechanism which have moved the hands of the dial, or the counting of holes in such a paper and the inspection

of the machinery which made the holes, the sorting and counting of votes by election officers. If it be said that these are the best and most efficient means to secure a free and honest election, the answer is that they are not the means prescribed for those ends by the Constitution. The Constitution does not authorize the General Court to put the expression of the voter's will to the chance of being nullified or perverted by slipping cogs, defective levers or other mechanical devices which have no living intelligence, no conscience and no liability to punishment to insure their going right. It requires that every step in the task of seeing that votes, whether given by Indian corn and beans or other ballots, by show of hands, by the living voice or by paper writing, are counted rightly, shall be intrusted to and performed, not by an inanimate machine but by sworn officers, and in open meeting, where each step of the work can be verified and mistakes corrected.

In our opinion, the General Court has not the right to authorize the use of the machines mentioned in your order, at elections by the people of the Governor, the Lieutenant Governor, the Councillors, Senators and Representatives, the Secretary, the Treasurer and Receiver General, the Auditor or the Attorney General.

A law of Congress requires votes for Representatives in Congress to be by written or printed ballot or voting machine, the use of which has been duly authorized by State law. In our opinion the General Court has the right to authorize the use of the machines referred to in your order in elections for Representatives in the Congress of the United States.

In the case of electors for President and Vice-President, it might, perhaps, be different, although long usage has given to the manner in which they are now chosen almost the force of an inviolable sanction.

JAMES M. MORTON.
JAMES M. BARKER.
JOHN W. HAMMOND.

ON FEBRUARY 4, 1901, the one hundredth anniversary of the day on which JOHN MARSHALL took his seat as Chief Justice of the Supreme Court of the United States, which was celebrated throughout the country as John Marshall day, the full court came in at ten o'clock A. M., Chief Justice HOLMES, and Justices MORTON, LATHROP, HAMMOND and LORING being present and also His Excellency WINTHROP MURRAY CRANE, Governor of the Commonwealth, who sat at the right of the Chief Justice.

Upon the opening of the court, the Attorney General addressed the court as follows :

May it please the court : Upon this morning, a century ago, the Supreme Court of the United States assembled for the first time in the city of Washington. The term city was one of courtesy rather than of description ; for it was a place of swamps and woods, a city without inhabitants, a town without houses. Even Pennsylvania Avenue, to-day the most distinctly national, if not the most historic, street in America, was a morass covered with underbrush, impassable to horse or foot, without visible demarcation, a tangled wilderness. There was only the dream of a capital. But in that city and upon the very eminence where it met this day one hundred years ago, the court has since always been held, though more than once within sound, even within the very sight, of the guns of the enemies of the Republic.

It happened, moreover, that on this same day, and in this same place, the commission of a new chief justice was read ; and the term was presided over for the first time by one who was destined, for more than a third of the century that has since intervened, to direct and control the policy of the court, and to establish the place which it has since maintained, not only as one of the three great and co-ordinate departments of the Government of the Republic, but also as the most august and powerful tribunal in the civilized world. This new chief justice was John Marshall of Virginia.

The bar of the United States has deemed these two auspicious events of sufficient moment to deserve the attention of the courts upon the occasion of this anniversary. Occurring, by one of those signal coincidences with which history is replete, upon the first judicial day of the nineteenth century, they also marked the birth and beginning, if not the creation and the cause, of the national grandeur which has characterized that century. Indeed, so closely have we come to trace cause and effect between the judgments of that court and the growth of the nation, that to-day, even upon this threshold of another century, when, as then, men are at issue upon a momentous question of the future policy of the United States, the voice of clamor is hushed, and Congress waits until this same august tribunal pronounces the decree which shall bind or expand, as the case may be, the wings of national ambition.

Up to that time the importance of the Supreme Court in the scheme of the Federal Government had scarcely been appreciated. In the original proposals for the erection of a capitol, prepared, I believe, under the direction of George Washington himself, no provision was made for the accommodation of the court. The founders of the nation had inherited the traditions of the mother country, where, owing to the absolute power of Parliament, the function of the judiciary was limited to the settlement of private disputes, its only relation to the Government being on the criminal side. The idea of enforcement of constitutional limitations by the judiciary upon the other departments of the Government and upon the States, axiomatic as such doctrines appear to us, was at that time by no means understood, much less conceded.

Even the justices themselves failed to realize their importance. Appointments to the bench were often declined, and resignations were frequent. Some judges retired to go upon the bench of a State court. Both of the chief justices who preceded Marshall (not counting Rutledge, whose appointment was not confirmed, and who presided only one term) resigned their offices to become ministers to foreign courts, and Jay, the first chief justice, when asked after an interval of retirement to resume his position, declined, saying, " I left the bench perfectly convinced that, under a system so defective, it could not attain

the energy, weight, and dignity which were essential to its afford-
ing due support to the national Government."

The whole business of the court during the first eleven years
of its existence is recorded in less than a single volume of the
size of current reports.    Most of the questions before it con-
cerned procedure and practice in the federal courts.    The
meagre decisions touching the scope of its own powers and
duties, were for the most part confined to denial rather than
assertion, like its refusal to advise the President, and its decid-
ing, or rather its hesitation in deciding, in Hayburn's case, that
Congress could not impose upon it the duty of acting as auditor
to hear pension claims.    It did assert the right to hear the case
of a citizen against a State, and to enter judgment against the
State; but this right was promptly taken away by an amend-
ment to the Constitution.    Even Marshall continued to be a
member of the President's Cabinet after his appointment to the
bench, until the close of the presidential term.    So little was
the true function of the court understood that one of the earliest
cases reported seems to have consisted of the trial of issues of
fact by a jury, the charge being given by one of the justices.
It had been a court of weak beginnings and of insignificant
achievements.    It had not found its place in the scheme of the
Government.    When the nineteenth century came in its great
work was yet before it.

The Federal Constitution was no spontaneous utterance of a
united people.    It was the result of a long, a bitter, and unend-
ing contest.    The conflict between the sovereignty of the State
and the sovereignty of the nation did not then begin, nor is it
yet ended.    Although, when the only alternative in sight was
anarchy, a sullen assent was vouchsafed to the terms of the
Constitution, both sides reserved the right to continue the con-
test.    Both claimed that it could be interpreted to meet their
views.    Moreover, upon its adoption other contentions arose
upon the question of how far it acted as a restraint upon the
executive and the legislative departments.    The beginning of
this century saw these contentions, and especially that relating
to the sovereignty of the States, existing in all their fierceness,
threatening the destruction of the Republic.    The nation was at
the parting of the ways.

The only power adequate to the settlement of these questions under the Constitution (and even this was not then conceded) was the Supreme Court. But a chief was needed to direct the work of that court, who should have the courage to assert its dignity and power. He must be one who had participated in the discussions leading to the adoption of the Constitution, familiar with its origin and its history. He must be not only a great and sound lawyer, but one whose public career, no less than the spotlessness of his personal reputation, had earned for him the respect and confidence of all men. He must be one who was willing to put aside all private ambition, and make it his life work to establish the rank of the court given to it by the Constitution, but which hitherto had scarcely been conceded to it; in concession to her importance it were better that he be a citizen of Virginia; and John Adams naturally believed he should be a Federalist. He found all these essentials in John Marshall. The hour of fate had come; and he was the man of the hour.

Speculations on what might have been the result had important events happened otherwise than they did, are usually profitless. But one cannot forbear indulging in a shudder at the contemplation of what might have been the destiny of the nation had the appointment of chief justice been made a few months later by that apostle of the anti-Federalists, Thomas Jefferson. One experiment of a league of sovereign States had been tried and had failed. Another would have meant hopeless wreck. More than once, as we review the events of our history, are we led to recognize with reverence the hand of an overruling Providence, guiding our path, shielding us from danger and destruction, chastening us when we have gone astray, and leading us on to become the lamp of liberty enlightening the world.

John Marshall grasped the helm with the hand of a master. There was no chart to guide his course, excepting his conception of the spirit of the Constitution. But that conception was based upon a belief in the sovereignty of the nation, and was elevated by a conviction of the power and dignity of the judicial branch of the Government. Within three years he had disposed of a contention, seriously made, that Congress was not bound by the Constitution, excepting as it might interpret for itself the terms

of that instrument. He pronounced one of its statutes void, and thus asserted the supremacy of his court over the legislative department, — a supremacy which has never since been challenged, and which it is difficult for us now to conceive ever to have been challenged. Soon after he pronounced void an act of a State legislature which was in violation of the Constitution of the United States. Then men began to appreciate the fact that the Federal power was supreme, and that, under the interpretation of John Marshall, the Constitution did not provide a mere rope of sand for the States, but was the strong tie which bound them together into a nation.

From these sound beginnings he proceeded with unfaltering steps, literally building up a nation upon the foundation of the Constitution. His views did not at first, nor even during his life, meet with universal acquiescence. During the whole of the two generations of his judicial service, he was the subject of bitter criticism, and more than once there was almost open revolt. He himself at times became disheartened, and in a letter to his associate, Joseph Story, in 1832, he said : " I yield slowly and reluctantly to the conviction that our Constitution cannot last." This was but three years before his death, and it may well be that his last hours were clouded with doubts of the future of his country. But he had builded more wisely and surely than he knew. His interpretation of the spirit of the Constitution, besides having the weight of authority, came eventually to be accepted as well for the truth of its resistless logic. He was not merely a great and learned judge. There have been others. His title to the eternal gratitude of his countrymen is found in the fact that he was the creator of constitutional government, as we now understand that term. The result of his work is the grandeur of the imperial flag under which we live.

Of the life and career of John Marshall it is not for me to speak in detail on this occasion. It will be better done on this anniversary by others more competent for the task. Beyond declaring his part in the growth of the nation, as I have briefly attempted to do, I will content myself with observing that, considered merely as a judge, his career was a model for all who have come after. Dignified and genial, patient in attention, learned and logical, luminous and convincing in opinions ; wel-

coming the help that the bar can give to the court; not lacking in respect for the executive and legislative departments, and for that presumption of right which should be accorded to them, but never forgetting that the function of the court is to be true to its own lights and not subservient to the standard of the Legislature, — he created for the court a respect and esteem which has never since been shaken, and established a standard of judicial deportment which may well be followed to-day.

But it is by the high principles he promulgated and upheld, and upon which this nation has grown to grandeur, rather than by any mere judicial eminence, that he will be remembered while the nation endures.

As I stood, last month, upon the steps of the national Capitol, I was led to contrast in my mind the splendid panorama there unfolded with the rude beginnings of a century ago. But I also reflected that in the luminous clearness of John Marshall's vision there has been, there can be, no advance. A hundred years hence the material achievements of the nation may eclipse those of to-day, even as we have surpassed those of the founders of the Republic; or, on the other hand, some future Marius may contemplate from the same eminence upon which I stood the ruins of a great nation. The things of this world pass away and are forgotten. But the prophetic wisdom and truth of the principles enunciated by John Marshall will endure as long as the nation lives, and his courage and sagacity in discovering and establishing them will be his deathless renown.

In view of the solemnity of this anniversary and of what it means to us and to our fathers and to our children as well, I have the honor to suggest in behalf of my associates that the work of the court be suspended for the day, that the bar and the court may appropriately celebrate the occasion; and to that end I move that the court do now adjourn.

CHIEF JUSTICE HOLMES responded as follows: As we walk down Court Street in the midst of a jostling crowd, intent like us upon to-day and its affairs, our eyes are like to fall upon the small, dark building that stands at the head of State Street, and, like an ominous reef, divides the stream of business in its course to the gray cliffs that tower beyond. And, whoever we may be,

we may chance to pause and forget our hurry for a moment, as we remember that the first waves that foretold the coming storm of the Revolution broke around that reef. But, if we are lawyers, our memories and our reverence grow more profound. In the old State House, we remember, James Otis argued the case of the writs of assistance, and in that argument laid one of the foundations for American constitutional law. Just as that little building is not diminished, but rather is enhanced and glorified, by the vast structures which somehow it turns into a background, so the beginnings of our national life, whether in battle or in law, lose none of their greatness by contrast with all the mighty things of later date, beside which, by every law of number and measure, they ought to seem so small. To us who took part in the Civil War, the greatest battle of the Revolution seems little more than a reconnoissance in force, and Lexington and Concord were mere skirmishes that would not find mention in the newspapers. Yet veterans who have known battle on a modern scale, are not less aware of the spiritual significance of those little fights, I venture to say, than the enlightened children of commerce who tell us that soon war is to be no more.

If I were to think of John Marshall simply by number and measure in the abstract, I might hesitate in my superlatives, just as I should hesitate over the battle of the Brandywine if I thought of it apart from its place in the line of historic cause. But such thinking is empty in the same proportion that it is abstract. It is most idle to take a man apart from the circumstances which, in fact, were his. To be sure, it is easier in fancy to separate a person from his riches than from his character. But it is just as futile. Remove a square inch of mucous membrane, and the tenor will sing no more. Remove a little cube from the brain, and the orator will be speechless; or another, and the brave, generous and profound spirit becomes a timid and querulous trifler. A great man represents a great ganglion in the nerves of society, or, to vary the figure, a strategic point in the campaign of history, and part of his greatness consists in his being *there*. I no more can separate John Marshall from the fortunate circumstance that the appointment of chief justice fell to John Adams, instead of to Jefferson a month later, and so gave it to a Federalist and loose constructionist to start the

working of the Constitution, than I can separate the black line through which he sent his electric fire at Fort Wagner from Colonel Shaw. When we celebrate Marshall we celebrate at the same time and indivisibly the inevitable fact that the oneness of the nation and the supremacy of the national Constitution were declared to govern the dealings of man with man by the judgments and decrees of the most august of courts.

I do not mean, of course, that personal estimates are useless or teach us nothing. No doubt to-day there will be heard from able and competent persons such estimates of Marshall. But I will not trench upon their field of work. It would be out of place when I am called on only to express the answer to a motion addressed to the court and when many of those who are here are to listen this afternoon to the accomplished teacher who has had every occasion to make a personal study of the judge, and again this evening to a gentleman who shares by birth the traditions of the man. My own impressions are only those that I have gathered in the common course of legal education and practice. In them I am conscious, perhaps, of some little revolt from our purely local or national estimates, and of a wish to see things and people judged by more cosmopolitan standards. A man is bound to be parochial in his practice— to give his life, and if necessary his death, for the place where he has his roots. But his thinking should be cosmopolitan and detached. He should be able to criticise what he reveres and loves.

The "Federalist," when I read it many years ago, seemed to me a truly original and wonderful production for the time. I do not trust even that judgment unrevised when I remember that the "Federalist" and its authors struck a distinguished English friend of mine as finite; and I should feel a greater doubt whether, after Hamilton and the Constitution itself, Marshall's work proved more than a strong intellect, a good style, personal ascendancy in his court, courage, justice and the convictions of his party. My keenest interest is excited, not by what are called great questions and great cases, but by little decisions which the common run of selectors would pass by because they did not deal with the Constitution or a telephone company, yet which have in them the germ of some wider theory, and therefore of some profound interstitial change in the very

tissue of the law. The men whom I should be tempted to commemorate would be the originators of transforming thought. They often are half obscure, because what the world pays for is judgment, not the original mind.

But what I have said does not mean that I shall join in this celebration or in granting the motion before the court in any half-hearted way. Not only do I recur to what I said in the beginning, and remembering that you cannot separate a man from his place, remember also that there fell to Marshall perhaps the greatest place that ever was filled by a judge; but when I consider his might, his justice, and his wisdom, I do fully believe that if American law were to be represented by a single figure, sceptic and worshipper alike would agree without dispute that the figure could be but one alone, and that one John Marshall.

A few words more and I have done. We live by symbols, and what shall be symbolized by any image of the sight depends upon the mind of him who sees it. The setting aside of this day in honor of a great judge may stand to a Virginian for the glory of his glorious State; to a patriot for the fact that time has been on Marshall's side, and that the theory for which Hamilton argued, and he decided, and Webster spoke, and Grant fought, and Lincoln died, is now our corner-stone. To the more abstract but farther-reaching contemplation of the lawyer, it stands for the rise of a new body of jurisprudence, by which guiding principles are raised above the reach of statute and State, and judges are entrusted with a solemn and hitherto unheard-of authority and duty. To one who lives in what may seem to him a solitude of thought, this day — as it marks the triumph of a man whom some Presidents of his time bade carry out his judgments as he could — this day marks the fact that all thought is social, is on its way to action; that, to borrow the expression of a French writer, every idea tends to become first a catechism and then a code; and that according to its worth his unhelped meditation may one day mount a throne, and without armies, or even with them, may shoot across the world the electric despotism of an unresisted power. It is all a symbol, if you like, but so is the flag. The flag is but a bit of bunting to one who insists on prose. Yet, thanks to Marshall and to the men of his genera-

tion — and for this above all we celebrate him and them — its red is our life-blood, its stars our world, its blue our heaven. It owns our land. At will it throws away our lives.

The motion of the bar is granted, and the court will now adjourn.