## OPINION OF THE JUSTICES TO THE SENATE.

*Constitutional Law*, Apportionment of legislators, Equal protection of laws, Invalid provision of State Constitution. *General Court. Words,* "Legal voters."

Discussion of equality of population among legislative districts under the equal protection clause of the Fourteenth Amendment of the Federal Constitution. [793-797]

In answer to a question by the Senate as to the constitutionality of proposed legislation apportioning representatives, the Justices stated that it was wholly uncertain whether the Supreme Court of the United States would give judicial approval to provisions allocating one representative each to the island counties, Nantucket County and the County of Dukes County, or to provisions which, by adherence to county lines, would result in an apportionment substantially different from that based on population alone. [797-798]

Art. 21 of the Amendments of the Massachusetts Constitution, in so far as it requires an apportionment of representatives on the basis of legal voters and thereby appears to bring about an apportionment substantially different from that based on population is invalid as contrary to the equal protection clause of the Fourteenth Amendment of the Federal Constitution. [799]

Where a provision of a State Constitution is invalid as in violation of the Federal Constitution, legislation may be enacted by the State legislature disregarding such invalid provision. [799]

On October 31, 1967, the Justices submitted the following answer to a question propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit this answer to a question in an order adopted by the Senate on October 3, 1967, and transmitted to us on October 5. The order recites the pendency before the Senate of an engrossed bill, House No. 5000, entitled, "An Act apportioning representatives to the several counties of the commonwealth and providing that each representative shall represent an equal number of inhabitants, as nearly as may be." A copy was transmitted with the order, which recites that the bill was enacted by both Houses, laid before the

Governor for his approbation, and recalled at the request of the Senate, which has reconsidered enactment.

The order recites that the bill apportions 238 representatives to the several counties, except the County of Dukes County and Nantucket County (the island counties), equally as nearly as may be, on the basis of population according to the census of the inhabitants taken in 1965, and, consistent with the requirements of art. 21 of the Articles of Amendment, as appearing in art. 71 of the Amendments, assigns one representative to each of the island counties.

The order also recites that the bill provides that the county commissioners in all except Suffolk County and the island counties, and in Suffolk County the commissioners to apportion that county into representative districts, shall divide their respective counties into districts and assign representatives so that each representative will represent an equal number of inhabitants, as nearly as may be.

The order contains a table (Appendix A hereto), which compares apportionment of 238 representatives to the twelve mainland counties by legal voters with apportionment by population. Also shown is the assignment of one representative to each of the island counties.

Further recitals are that the use of legal voters instead of population as a basis would produce (1) a substantially different distribution of legislators in six of the twelve mainland counties; and (2) "a substantially different distribution of legislators, proportionately, between representative districts in the same county."

Important considerations affecting apportionment are set forth in the order. The lesser ratio of legal voters to population in many units is attributable to various causes, including economic, sociological, and ethnic factors, by reason of which there is a lesser degree of political activity among adult citizens domiciled therein, particularly in certain wards in Boston in which the population is predominantly "non-white." Such lesser ratio in such wards in Boston, for example, would make it difficult, if not impossible, in dividing Suffolk County into representative

districts composed of contiguous territory and assigning representatives thereto by the use of the legal voter basis instead of a population basis, not to produce "a substantially different distribution of legislators, proportionately, between representative districts in said county," or not to divide "non-white" inhabitants so as, in effect, to deny them their share of representation.

The order further declares that "While the assignment of one representative to each of the island counties, as required by said Article XXI, is a departure from a strict 'equally as nearly as may be' population basis (or a legal voter basis), the historic, economic, geographic and constitutional basis for such departure, which, standing alone, may be inadequate justification, is coupled with the fact that in this instance, the resultant under-representation of the balance of the population of the commonwealth amounts to the difference between the norm of 22,205 inhabitants per representative for 238 representatives and 22,063 inhabitants per representative for 240 representatives, which is only 142 inhabitants out of a total of 22,205 or .0064 per cent, and therefore such departure would not seem to submerge or dilute the population basis for representation to any significant degree."

The concluding recital is that grave doubt exists as to the constitutionality of the said bill if enacted into law.

The question is:

"Is it constitutionally competent for the general court to enact legislation apportioning representatives to the several counties and providing that the county commissioners and the commissioners to apportion Suffolk County into representative districts divide their respective counties into representative districts and assign representatives thereto on the basis of population as determined by the state decennial census of 1965, as provided in said engrossed bill?"

The question is broad in scope and covers both the Constitution of the United States and the Constitution of the

Commonwealth. Because of its great importance and the large number affected we, for the first time in present memory, invited interested persons to file briefs. In response, briefs or other data were filed by the Attorney General, the Senate Counsel, the House Counsel, the county commissioners of the County of Dukes County, the county commissioners of Nantucket County, the corporation counsel of the city of Boston, and a private individual who is a party to similar litigation pending in the Supreme Judicial Court for Suffolk County.

Constitutional doubt as to the power of a State to apportion its representatives is of very recent origin. The issue first arose out of the majority decision in *Baker* v. *Carr*, 369 U. S. 186, decided in 1962, where intervention in the apportionment of seats in the Tennessee General Assembly was recognized as permissible under the equal protection clause of the Fourteenth Amendment.

Many similar cases followed. In 1964 there were decided cases concerning six States, usually collectively cited as *Reynolds* v. *Sims*, 377 U. S. 533. In that case the majority stated: "We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State" (p. 568).

One cannot be sure what precise course the Supreme Court of the United States will adopt in future decisions in apportionment cases. That there is still uncertainty in many aspects of the subject is attested by the large number of cases with additional issues which have continued to arise.

As we turn to consideration of the precise provisions of House No. 5000, three principal grounds for discussion readily occur. The first is the great disparity caused by the assignment of one representative to each island county. In *Swann* v. *Adams*, 385 U. S. 440, 444, it was said:

"*Reynolds* v. *Sims, supra,* recognized that mathematical exactness is not required in state apportionment plans. *De minimis* deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed *de minimis* and none of our cases suggest that differences of this magnitude will be approved without a satisfactory explanation grounded on acceptable state policy." This language seems to place upon a State the burden of justifying variations in population in legislative districts.

The reasons for the assignment of one representative to each island county are stated in House No. 5000, § 1, entitled, "*Statement of Legislative Purpose,*" and are in part as follows: "[T]hese are islands, isolated, not readily accessible and most difficult to merge with any portion of the mainland. Even if both were combined and merged with a district on the mainland, by sheer weight of numbers, that portion of the district on the mainland would most probably elect a resident of the mainland. Thus these two isolated islands would be without the kind of representation contemplated by the Fourteenth Amendment to the United States Constitution, because of the geographical difficulty of reaching their representative on the mainland for a 'redress of their grievances'. Therefore in the case of these two islands, to adhere to the letter of the law as most recently laid down by the United States Supreme Court, viz. 'one-man, one-vote', would be to figuratively disenfranchise the voters thereon. To subtract the proposed two representatives for Dukes and Nantucket from the total of two hundred and forty representatives provides an insignificant change in the norm for each district. Because of their exigency, and without being arbitrary or discriminatory, it is the sense of the General Court that each of these island counties should retain at least one representative as is now required by the Constitution of Massachusetts and that to maintain this status would not be a violation of the Fourteenth Amendment of the United States Constitution."

The foregoing justification does not conform to the mathematical criteria in two cases in the Supreme Court of the

United States. In *Swann* v. *Adams*, 385 U. S. 440, 442–444, a Florida reapportionment plan with a population variance ratio [1] between the largest district and the smallest district of 1.30 to 1 in the Senate and of 1.41 to 1 in the House was invalidated. In *Kilgarlin* v. *Hill*, 386 U. S. 120, 122–124, a Texas reapportionment plan with a population variance ratio of 1.31 to 1 in the House, which had been approved by the United States District Court, was reversed in part and the case was remanded for a determination whether the Texas policy of adhering to. county boundaries justified the discrepancies. In this Commonwealth, by contrast, were House Bill No. 5000 to be adopted, a population variance ratio of 6.73 to 1 would occur between the most underrepresented county (Hampshire with four representatives and a population of 100,065) with the most overrepresented county (Nantucket with one representative and a population of 3,714).

The mere fact that the two counties are islands would seem inadequate to justify the disparity in voting power which would result from such representation. In *Lucas* v. *Forty-fourth Gen. Assembly of Colo.* 377 U. S. 713, 738n, we read: ". . . the court below stated that the disparities from population-based senatorial representation were necessary in order to protect 'insular minorities' and to accord recognition to 'the state's heterogeneous characteristics.' Such rationales are, of course, insufficient to justify the substantial deviations from population in the apportionment of seats in the Colorado Senate under Amendment No. 7, under the views stated" in *Reynolds* v. *Sims*, 377 U. S. 533. In that case at pp. 577–581, may be found statements rejecting geographical considerations as a basis for disparity in voting power, and an insistence upon equality of population among the districts, along with a concession that valid considerations may underlie an effort to maintain the integrity of political subdivisions. Reading selectively for the most material quotations we find the following: "A State may legitimately desire to maintain the integrity of

---

[1] See 79 Harv. L. Rev. 1225, 1250–1251.

various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. [P. 578.] . . . Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State. . . . But neither history alone, nor economic or other sorts of [p. 579] group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing. A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. [P. 580.] . . . But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired. [P. 581.]."

On the other hand, it was said in *Roman* v. *Sincock*, 377 U. S. 695, 710: "[I]t is neither practicable nor desirable

to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

Then too, even in *Reynolds* v. *Sims, supra,* 577, it was said, "We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

The doubt hitherto expressed as to the probable future course of the Supreme Court of the United States is felt particularly in attempting to forecast whether that court would accept the legislative findings in § 1 as justification for the assignment of one representative each to the two island counties. The views expressed in the briefs are divided. So are the views of the Justices of this court. Our answer to the question can only be that it is wholly uncertain whether, with one representative allocated to each island county, House No. 5000 would be held to be valid by the Supreme Court of the United States. It thus seems fundamentally to be a question of policy for the General Court whether to adhere to assigning representatives to the island counties, and thus to risk an adverse ruling from higher judicial authority which could upset the entire apportionment.

The second ground for discussion concerns the 238 representatives in the mainland districts, and is substantially similar to that just discussed. It results from the disparity between representation computed on population alone and representation computed by adherence to county lines. By the latter method of apportionment the extreme examples of overrepresentation and underrepresentation are re-

spectively, Franklin County with three representatives and a population of 57,687, and Hampshire County with four representatives and a population of 100,065. These figures produce a population variance ratio of 1.30 to 1, a ratio which approaches those held constitutionally objectionable in the *Swann* and *Kilgarlin* cases hereinbefore discussed.

On this topic, the most definite statement we are able to make is that the figures contained in the bill carry no assurance of a stable apportionment which would meet with higher judicial approval. Whether to risk disapproval is again a question of policy for the General Court.

The third proposition for discussion is the effect of art. 21 of the Constitution of the Commonwealth which calls for representation by legal voters rather than by population. This article, as amended, provides, "The house of representatives shall consist of two hundred and forty members, which shall be apportioned by the general court, at its first regular session after the return of each special enumeration, to the several counties of the commonwealth, equally, as nearly as may be, according to their relative numbers of legal voters, as ascertained by said special enumeration . . .." As stated in *Opinion of the Justices*, 247 Mass. 583, 588, "The meaning and scope of the term 'legal voters' in articles 21 and 22 of the Amendments are the voters who possess the qualifications prescribed by the Constitution for voters and who have complied with statutory requirements so that they may lawfully cast their votes at an election." We are unaware of any firm policy of the Commonwealth which would require a strong preference for representation by legal voters rather than by population.

As shown in Appendix A we observe that there are six counties the representation of which would vary should apportionment be made on the basis of population rather than on legal voters. Based on the decennial census, a copy of which was submitted with the order, such an apportionment would affect the representation of 3,161,972 people, or 59.7% of the total population of the Commonwealth. This is illustrated by the following table:

|             |            | Number of representatives | |
|             |            | Art. 21 | H. No. 5000 |
|             | Population | By legal voters | By population |
|-------------|-----------:|:----:|:----:|
| Barnstable  | 73,557     | 4    | 3    |
| Essex       | 608,996    | 29   | 27   |
| Franklin    | 57,687     | 2    | 3    |
| Hampden     | 435,281    | 19   | 20   |
| Middlesex   | 1,280,235  | 59   | 58   |
| Suffolk     | 706,216    | 30   | 32   |
|             | 3,161,972  |      |      |

The deviation here considered would seem to be too great to be regarded as de minimis. We would expect this to be declared invalid. Accordingly, we are inclined to be of opinion that art. 21 is unconstitutional in so far as it requires apportionment on the basis of legal voters.

We realize that *Burns* v. *Richardson*, 384 U. S. 73, 93, held that an apportionment by registered voters satisfied the equal protection clause but "only because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis." This is clearly not the condition confronting us.

It is intimated in one brief, but without convincing authority, that if art. 21 violates the equal protection clause, the proper method of change is by constitutional amendment, and not by enacting new legislation. If, however, a State constitutional provision is violative of the Constitution of the United States and, therefore, void, legislation may be enacted disregarding the void provision. See *Opinion of the Justices*, 234 Mass. 597, 607. Of course, it should be hoped that a new constitutional apportionment plan would be forthcoming reasonably soon thereafter.

We beg to be excused from further answering the question.

RAYMOND S. WILKINS
JOHN V. SPALDING
ARTHUR E. WHITTEMORE
R. AMMI CUTTER
PAUL G. KIRK
JACOB J. SPIEGEL
PAUL C. REARDON

## Appendix A.

| | Number of Representatives | |
| | By legal voters | By population |
|---|---|---|
| Barnstable | 4 | 3 |
| Berkshire | 6 | 6 |
| Bristol | 19 | 19 |
| Dukes | 1 | 1 |
| Essex | 29 | 27 |
| Franklin | 2 | 3 |
| Hampden | 19 | 20 |
| Hampshire | 4 | 4 |
| Middlesex | 59 | 58 |
| Nantucket | 1 | 1 |
| Norfolk (excluding Cohasset) [1] | 25 | 25 |
| Plymouth (including Cohasset) [1] | 13 | 13 |
| Suffolk | 30 | 32 |
| Worcester | 28 | 28 |
| | 240 | 240 |

[1] Article 21, as amended, provides that "the town of Cohasset, in the county of Norfolk, shall, for this purpose [of enumeration], as well as in the formation of districts as hereinafter provided, be considered a part of the county of Plymouth . . . ."