CAROL R. TOBIAS & others[1] *vs.* SECRETARY OF THE
COMMONWEALTH & another.[2]

Suffolk. December 22, 1994. - March 9, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Elections*, Ballot. *Constitutional Law*, Elections, Opinions of the Justices.
*Supreme Judicial Court*, Opinions of the Justices.

Discussion of decisions, including opinions of the Justices, considering is-
sues arising under art. 48, General Provisions, III, Form of Ballot, both
before and after its amendment by art 74 of the Amendments to the
Constitution of the Commonwealth. [669-674]

The court concluded that the system described in G. L. c. 54, § 35A, as
amended through St. 1994, c. 129, pursuant to which the Secretary of
the Commonwealth may in certain circumstances prepare separate
sheets of paper containing ballot summaries and provide such sheets to
polling places for use by voters, is not contrary to the form of ballot
provision of art. 48, General Provisions, III, as amended by art. 74 of
the Amendments to the Constitution of the Commonwealth. [674-677]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on December 6, 1994.

The case was reported by *Wilkins*, J.

*Ruth A. Bourquin & Burton A. Nadler* for the plaintiffs.

*Peter Sacks*, Assistant Attorney General (*Michael Joseph
Connolly* with him) for the defendants.

The following submitted briefs for amici curiae:

*Thomas R. Kiley & Carl Valvo* for Kathleen L. Kiley &
others.

*George Dargo*, pro se.

*Philip S. Lapatin & Ieuan G. Mahony* for Denise A. Jill-
son & others.

---

[1]Robert Mahon, Deborah Bennett, and Ronald Elperin.

[2]Executive Council.

*David A. Nicholas, Joshua R. Kratka & Charles C. Caldart* for Massachusetts Student Public Interest Research Group & another.

*Sheila A. Murphy*, pro se.

WILKINS, J. We consider a question that a single justice of this court reported concerning the constitutionality of the system that the Secretary of the Commonwealth developed for use in the 1994 State election for the presentation to voters of the Attorney General's summaries of ballot questions.[3] The plaintiffs, each a registered voter, contend that the Secretary's system applicable to voting machines and electronic voting systems failed to comply with the requirements of art. 48, General Provisions, III, Form of Ballot, of the Amendments to the Constitution of the Commonwealth as amended by art. 74 of the Amendments.[4]

---

[3]The reported question reads as follows:

"1. Did the system developed by the Secretary for use in the November 8, 1994, state election for presentation to the voters of the Attorney General's summaries of the ballot questions, by which (except in certain municipalities) the summaries were placed on sheets of paper not physically attached to, but cross-referenced on, documents or devices upon which votes were recorded, comply with the requirements of Article 48, General Provisions, Part III of the Amendments to the Constitution of the Commonwealth?"

A second question, that we need not answer, reads as follows:

"2. If the answer to the first question is no, can it be determined on the record before this Court whether the results of the voting on the State ballot questions should be declared null and void?"

[4]Article 48, General Provisions, III, as amended by art. 74 of the Amendments, reads as follows:

"A fair, concise summary, as determined by the attorney general, subject to such provision as may be made by law, of each proposed amendment to the constitution, and each law submitted to the people, shall be printed on the ballot, and the secretary of the commonwealth shall give each question a number and cause such question, except as otherwise authorized herein, to be printed on the ballot in the following form: . . . ."

When we refer to art. 48, we mean that article as originally adopted by the people in 1918. When we refer to art. 48, as amended, we mean art. 48, as amended in 1944 by art. 74 of the Amendments.

The plaintiffs' complaint alleged that (1) no fair and concise summaries appeared on the ballots for the 1994 election (other than on paper ballots) as art. 48, as amended, requires and (2) the system that the State Secretary developed, pursuant to G. L. c. 54, § 35A, as amended through St. 1994, c. 129, was not followed for voters using voting machines and electronic voting systems.[5] The reported question concerns only the first issue alleged in the complaint.

The procedural background is not important to an understanding of the issue before us. It is sufficient to say that, pursuant to G. L. c. 211, § 4A (1992 ed.), the single justice transferred the case from the Superior Court to the Supreme Judicial Court for the county of Suffolk. After the parties had agreed on a statement of facts, the single justice reported the two questions. Five Justices heard oral argument on December 22, 1994, took the matter under advisement, and on December 27 issued an order that included the following: "The Justices participating in this matter now answer the first question in the affirmative and, therefore, need not answer the second question. An opinion or opinions will follow." This opinion explains the court's reasons for answering the first question in the affirmative.

We set forth certain information from the statement of agreed facts. There are three basic methods of voting cur-

---

[5]The 1994 amendment to G. L. c. 54, § 35A, struck out the last two sentences of the section and inserted the following sentence:

"When the state secretary shall determine that it is not feasible for the summary of any question or questions submitted to the people to appear on the voting machine, he shall prepare separate sheets of paper containing such summary and provide such sheets for each polling place, to be used by the voters casting their votes on the voting machine, and one such sheet shall be furnished to each voter as he prepares to cast his vote by the use of such a machine."

The plaintiffs do not directly challenge the Secretary's determination that it was not feasible to place the summaries of the nine ballot questions on voting machines.

Prior to its amendment in 1994, § 35A called for the Secretary to use separate ballots for questions when the Secretary concluded that it was not feasible to put a description or descriptions on voting machines. We are advised that this process was never used.

rently used in Massachusetts: voting machines by which votes are recorded by pushing levers, electronic voting systems, and paper ballots. "Voting machines provide levers by which the voter can indicate her or his selection of candidate or ballot question position. There are spaces of fixed size on the face of the machines for the names of the candidates and other ballot information, including summaries of ballot questions, to appear."

There are three basic methods for casting and counting votes by electronic voting systems in use in the Commonwealth: (1) data voting systems, that use punch cards of fixed size on which are printed candidates' names and other ballot information; (2) electronic voting machine punch cards of fixed size, on which candidates' names and ballot information are not directly printed, but which are inserted by the voter into marking units which cannot be removed from the voting booth by the voter and on which such ballot information is directly printed; and (3) optical scanner devices of which there are three types for which the voter fills in a bubble or draws a line on a piece of paper that can be read by an optical scanner.

The differences in these voting methods and the different ways by which absentee voters' votes were recorded in the various municipalities are not significant for the purpose of answering the reported question.[6] All these processes involve voting machines within the meaning of the 1994 amendment to G. L. c. 54, § 35A.

---

[6]In municipalities using paper ballots or voting machines, absentee voters voted on paper ballots on which summaries were printed directly. In municipalities using optical scanner devices and data voting systems, absentee voters voted on a piece of paper or card and were provided a separate sheet containing ballot question summaries that was not physically connected to, but was cross-referenced on, the sheet or card on which the votes were recorded. In municipalities using punch cards, absentee voters voted on a punch card and were provided a booklet (a) indicating which hole to punch on the punch card in order to vote for a particular candidate or to vote yes or no on a particular ballot question and (b) cross-referencing a separate handout setting forth the ballot question summaries.

We answered the reported question on the assumption that
the procedures described in the 1994 amendment were fol-
lowed. We assumed that the Secretary prepared separate
sheets containing the summaries of the nine ballot questions
for each polling place that used a voting machine of one of
the various sorts, to be used by voters in casting their votes,
and that one sheet was "furnished to each voter as he pre-
pare[d] to cast his vote." G. L. c. 54, § 35A, as amended.[7] It
is agreed that each ballot had on it the phrase "SEE
HANDOUT FOR BALLOT SUMMARIES." This action
involves a claim that those procedures were not followed in
many instances, but that question and the consequences of
any departure from the prescribed procedures are not before
us.

As it was adopted by the people in 1918, art. 48, General
Provisions, III, provided that each law submitted to the peo-
ple "shall be described on the ballots by a description to be
determined by the attorney-general subject to such provision
as may be made by law, and the secretary of the common-
wealth shall give each question a number and cause such
question, except as otherwise authorized herein, to be printed
on the ballot in the following form: . . . ." Article 48 then
set forth the form of the ballot question and directed that the
description of the proposal appear within the question.[8] Over
the next approximately twenty years, there were several oc-
casions in which the adequacy of an Attorney General's
description of a proposed law was challenged. See *Brooks* v.
*Secretary of the Commonwealth*, 257 Mass. 91, 99 (1926)
(description of proposed law inadequate); *Opinion of the
Justices*, 271 Mass. 582, 592 (1930) (same); *Evans* v. *Secre-
tary of the Commonwealth*, 306 Mass. 296, 300-301 (1940)

[7]Of course, when offered, no voter was obliged to take such a sheet, and
there is no reason a sheet once furnished and abandoned may not be used
again.

[8]"In the case of a law: Shall a law (here insert description, and state, in
distinctive type, whether approved or disapproved by the general court,
and by what vote thereon) be approved?" Boxes for a "yes" or "no" vote
followed.

(same); *Opinion of the Justices*, 309 Mass. 555, 561-562 (1941) (description of proposed law adequate); *Opinion of the Justices*, 309 Mass. 571, 587-591 (1941) (same). In each instance, the court or the Justices in deciding or answering the question laid stress on the mandatory aspect of the detailed provisions of art. 48.

In addition to questions concerning the sufficiency of an Attorney General's description of a ballot question, problems arose because of the length and complexity of some of those descriptions. In questions to the Justices, the House of Representatives inquired about the constitutionality of various solutions to the problem and met with firm resistance to any departure from a literal application of the language of the form of ballot provision of art. 48, General Provisions, III.

The first of these requests for an advisory opinion presents the circumstance that is closest to the one now before the court. *Opinion of the Justices*, 294 Mass. 610 (1936). In 1936, the House of Representatives had before it two bills that were said to be designed to make ballot questions more intelligible to the voters than previously. *Id.* at 611. One bill proposed that the description of the proposal not be printed on the ballot but instead be printed in an official pamphlet attached to each voting booth. The second bill proposed that the description of a proposed law not appear within the question but be printed below and be referred to within the question. *Id.* at 614-615. In response to questions about the constitutionality of each proposed law, the Justices unanimously opined that each proposal, if adopted, would be unconstitutional, because the detail of the relevant portion of art. 48 was mandatory and phrased with great care. The minute and clear direction of art. 48, they said, must be carried out only in the way directed. Although the exact rules of art. 48 "as matter of abstract reasoning might not be regarded as of essential importance," the "Form of Ballot" prescribed in art. 48 is an absolute, unvarying command. *Id.* at 615. It is this rigidity of analysis that we reject.

Next, in 1941, the Legislature had before it a bill that proposed that a *summarized* description of an initiative propo-

sal, prepared by the Attorney General, appear on the ballot when, in the Attorney General's opinion, a complete and comprehensive description would be too long and too complicated to be easily read and understood by voters in marking their ballots. *Opinion of the Justices*, 309 Mass. 631, 643-644 (1941). The Justices stated that a summarized description would not meet constitutional requirements. *Id.* Then, as promptly as constitutionally permissible, a proposed amendment of art. 48 of the Amendments was then submitted to the people and adopted. Article 74 of the Amendments, adopted in 1944, amended art. 48 to provide that a fair, concise summary of a proposed law could be set forth both (a) on the form used to obtain signatures in support of a measure (art. 48, The Initiative, II, § 3, as amended by art. 74, § 1) and (b) on ballots (art. 48, General Provisions, III, as amended by art. 74, § 4). The people in effect rejected one aspect of the rigid language in art. 48 that had been identified by this court and its Justices.[9]

A somewhat parallel history appears in earlier developments that led to the constitutional authority to use voting machines in the Commonwealth. In *Nichols v. Election Comm'rs of Boston*, 196 Mass. 410 (1907), a divided court held that the use of a voting machine would not result in the election of candidates "chosen by written votes," as required by the Constitution of the Commonwealth. *Id.* at 412. The majority concluded that the use of a machine of the type involved "seem[s] so great a departure from the method referred to in the language of the Constitution as not to be included within its broadest meaning." *Id.* at 414. "[I]t seems too great a stretch of language to say that the use of

---

[9]The 1944 amendment did not, however, eliminate contention concerning the adequacy of an Attorney General's characterizations of proposed initiative provisions. See *Massachusetts Teachers Ass'n v. Secretary of the Commonwealth*, 384 Mass. 209, 228-229 (1981), and authorities cited. The tendency since 1944, however, has been toward a less rigid, more tolerant view that, despite some relatively minor errors or omissions, an Attorney General's summary will meet constitutional requirements. *Id.*

[a machine] is the expression of a choice by a written vote."
*Id.* at 414-415.

Six years earlier, in response to a question from the House
of Representatives, the Justices then serving had divided on
the same general subject of voting machines. See *Opinion of
the Justices*, 178 Mass. 605 (1901). Three Justices, including
Chief Justice Holmes and Justice Knowlton, who had not
changed his mind when later (as Chief Justice) he wrote for
the court in *Nichols* v. *Election Comm'rs of Boston, supra* at
413, concluded that voting machines were permissible under
the Constitution of the Commonwealth. These three Justices
reiterated a principle stated by Chief Justice Parker in 1830
in answering a different question involving the same constitu-
tional requirement of "written votes." See *Opinion of the
Justices*, 178 Mass. at 607, citing *Henshaw* v. *Foster*, 9 Pick.
312 (1830). Chief Justice Parker had written late in his
career:

> "We are to suppose that those who were delegated to
> the great business of distributing the powers which em-
> anated from the sovereignty of the people, and to the
> establishment of rules for the perpetual security of the
> rights of person and property, had the wisdom to adapt
> their language to future as well as existing emergencies;
> so that words competent to the then existing state of the
> community, and at the same time capable of being ex-
> panded to embrace more extensive relations, should not
> be restrained to their more obvious and immediate
> sense, if, consistently with the general object of the au-
> thors and the true principles of the compact, they can
> be extended to other relations and circumstances which
> an improved state of society may produce." *Henshaw* v.
> *Foster, supra* at 317.

The three Justices continued, saying that the picture that the
framers of the Constitution had in mind is not as important
as what benefits they sought to secure or evils to prevent by
the language chosen. *Opinion of the Justices*, 178 Mass. at

607. Although we adopt this approach in deciding the issue before us, that approach did not attract a majority of the Justices in 1907. *Nichols* v. *Election Comm'rs of Boston*, *supra*. Four years later in 1911, the people adopted art. 38 of the Amendments to the Constitution of the Commonwealth, authorizing the use of voting machines or other mechanical devices for voting "under such regulations as may be prescribed by law." We shall return to this constitutional provision authorizing the use of voting machines under regulations prescribed by law.

Before setting forth our reasons for concluding that the processes described in G. L. c. 54, § 35A, as amended through St. 1994, c. 129, comply with the requirements of art. 48, we point to a 1950 case that divided the Justices of this court. See *Lincoln* v. *Secretary of the Commonwealth*, 326 Mass. 313 (1950). That case emphasizes the differences in approach between the old view of how art. 48, as amended, should be construed and the newer view that we adopt and that prevailed in that case. Article 48, The Initiative, then provided that, if an initiative petition introduced into the General Court is signed by not less than 20,000 qualified voters, votes must be taken on the matter in the Legislature. See art. 48, The Initiative, II, § 4, and V, § 1, prior to its 1950 amendment. Article 48, General Provisions, II, states that "[n]ot more than one-fourth of the certified signatures on any petition shall be those of registered voters of any one county." In the fall of 1949, signatures were gathered in support of an initiative petition, and, on December 7, 34,034 certified signatures were filed with the Secretary of State. *Lincoln* v. *Secretary of the Commonwealth*, *supra* at 315. More than 8,900 certified signatures were obtained from both Middlesex and Suffolk County voters, in each case more than one-fourth of all the signatures submitted. *Id.* at 315-316. The plaintiffs argued that, because more than one-fourth of the certified signatures came from Middlesex County and also because more than one-fourth of the certified signatures came from Suffolk County voters, the require-

ments of that provision had not been met and the initiative proposal should not be submitted to the voters. *Id.* at 316.

A majority of the court concluded that the relevant provision limited the number of certified signatures to be counted from any one county to 5,000, but that, if the needed total of 20,000 were reached using that limitation, the excess and unusable signatures did not invalidate the process. *Id.* at 317-318. The majority stated that "we are interpreting [the Constitution's] words in the sense most obvious to the common intelligence, in the way that the ordinary voter must have understood them, and in a way that does not render illusory these reserved rights of the people. The unfortunate contrary result reached by the minority opinion we believe to be due to oversimplification of the issue." *Id.* at 319. The dissenters, however, found the answer in a literal reading of art. 48, as amended, which, they believed, compelled the conclusion that art. 48, as amended, had not been complied with and that the answer was "perfectly clear" in the relevant sentence. *Id.* at 321, 322-323 (Qua, C.J., dissenting). Too many signatures from one county spoiled the process. The court, in the dissenters' view, went "beyond the proper function of construction or interpretation" and in effect amended the Constitution. *Id.* at 324.[10]

We subscribe to an interpretation of art. 48, as amended, that will achieve its stated purposes. We reject any restrictive reading of art. 48, as amended, that results in a failure to give effect to the purpose for which its words were chosen. We believe that Chief Justice Parker had it right when, in 1830, construing a provision of the Constitution concerning voting, he said that words should be capable of being extended, if consistent with the general object of the authors, "to other relations and circumstances which an improved state of society may produce." *Henshaw* v. *Foster*, 9 Pick. 312, 317 (1830).

---

[10]The division within the court was the same as that of the Justices when earlier that year they had submitted opinions to the Senate on the same issue, when the proposal was pending in the Legislature. See *Opinions of the Justices*, 326 Mass. 781 (1950).

In reaching this conclusion, we necessarily reject an approach to art. 48, as amended, of the type that controlled the Justices' views of art. 48 in *Opinion of the Justices,* 294 Mass. 610 (1936). Opinions of the Justices do not have precedential value, and any question answered is fully open for consideration when later presented in a litigated case. See *Massachusetts Taxpayers Found., Inc.* v. *Secretary of Admin.,* 398 Mass. 40, 44 (1986); *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank,* 356 Mass. 202, 208 (1969). In certain instances, the court has declined to follow an opinion submitted by the Justices. See, e.g., *Ierardi, petitioner,* 366 Mass. 640, 650 (1975). The 1936 *Opinion of the Justices, supra,* does not recognize that the use of voting machines required that the description of a proposed law be printed in the voting booth (but perhaps on the machine) apart from the place on which the voter's choice is recorded. Indeed that opinion says nothing about voting machines. Voting machines had been constitutionally recognized from a date prior to the adoption of art. 48 and were then authorized by statute. St. 1913, c. 835, §§ 250-256.[11] The difference between placing a description on a voting machine or on the wall near a voter seems insignificant. In 1936, the Justices did not, however, discuss the similarity between what was proposed and the manner in which voting machines would be used, and there is no way to know whether the point was brought to their attention.[12]

We conclude that there is nothing contrary to the form of ballot provisions of art. 48, General Provisions, III, in the procedure prescribed in G. L. c. 54, § 35A, as amended

---

[11]Few, if any, Massachusetts municipalities were using voting machines in 1936.

[12]At that time and for many years before and after, the Justices did not accept briefs from parties who might be interested in any answer that might be given. The practice changed in 1967. See *Opinion of the Justices,* 353 Mass. 790, 793 (1967) ("Because of its great importance and the large number affected we, for the first time in present memory, invited interested persons to file briefs"). The receipt of briefs tends to delay the Justices' responses but often aids in their understanding of the depth and range of problems presented by a request for an advisory opinion.

through St. 1994, c. 129. When the Secretary determines that it is not feasible for the summaries to appear on voting machines, the preparation of separate sheets of paper containing the Attorney General's various summaries and the furnishing of a sheet to each voter "as he prepares to cast his vote by the use of such a machine" fulfils the basic purpose of having each voter capable of informing him or herself concerning the questions on which that voter may vote. Our construction of art. 48, as amended, retains the substance of the provisions of art. 38 which earlier had authorized the use of voting machines "under such regulations as may be prescribed by law." Construing art. 38 along with the "Form of Ballot" provisions of art. 48, as amended, we can give effect to the authorization to legislate concerning voting machines while, at the same time, assuring that the objectives of disclosure contained in art. 48, as amended, are not overridden. We decline to accept any contention that the adoption of art. 48 or of art. 74 impliedly repealed any portion of the Legislature's right to act under art. 38, except that we acknowledge that the Legislature may not use its art. 38 powers to contravene the disclosure objectives of art. 48, as amended.[13]

It has been argued to us that the form of ballot provision of art. 48, as amended, contains an explicit authorization to enact legislation such as the 1994 amendment of G. L. c. 54, § 35A. "A fair, concise summary, as determined by the attorney-general, *subject to such provision as may be made by law*, of . . . each law submitted to the people, shall be printed on the ballot and the secretary of the commonwealth shall give each question a number and cause such question,

---

[13]For the purposes of answering the first reported question, we accept, without deciding, the premise of the plaintiffs' argument that art. 48, as amended, applies to voting machines and electronic voting processes. The defendants do not argue to the contrary, and the reported question appears to make the same assumption. If art. 48, as amended, applies to voting processes other than the use of paper ballots, the word "ballot" must acquire a broad meaning, one so broad that the definition cannot stop before it includes an available document containing the Attorney General's descriptive summaries and the device by which, and the document on which, a voter's choice is expressed.

*except as otherwise authorized herein,* to be printed on the ballot" in the form prescribed (emphasis added). Article 48, General Provisions, III, as amended by art. 74. In the 1936 *Opinion of the Justices,* 194 Mass. 610 (1936), the Justices announced that the power of the General Court under the form of ballot provision of art. 48, which contained the same words that we have emphasized above in the quotation from art. 74, applied only to the description to be determined by the Attorney General. *Id.* at 613. We need not decide whether that view is one that we would adopt under art. 48, as amended. The emphasized language must have some purpose, and it recognizes that there may be some circumstance in which the Secretary of the Commonwealth need not cause a question to be printed on the ballot in the form set forth in the form of ballot provision of art. 48, as amended. Even if we assume that art. 48, as amended, does not contain explicit authority for the Legislature to pass the 1994 amendment of G. L. c. 54, § 35A, the purposes of art. 48, as amended, are not contravened by that legislation whose enactment has independent justification in art. 38 concerning voting machines, and art. 48, General Provisions, VII ("legislation not inconsistent with anything herein contained may be enacted to facilitate the operation of its provisions").

We have answered the first reported question in the affirmative, and need not answer the second reported question.