GAIL M. MILLER & others[1] vs. SECRETARY OF THE
COMMONWEALTH.

Suffolk. June 10, 1998. - July 23, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Elections*, Ballot, Validity of petition. *Referendum. Constitutional Law,* Elections, Referendum. *Massachusetts Technology Park Corporation. Department of Telecommunications and Energy.*

Discussion of the provision of art. 48, The Referendum, Part III, § 2, of the
    Amendments to the Massachusetts Constitution, that excludes from the
    referendum process appropriations for the Commonwealth or any of its
    departments, boards, commissions, or institutions. [84-85]
The Massachusetts Technology Park Corporation, which, pursuant to St. 1997,
    c. 164, § 68 (*b*), is authorized to draw on the Massachusetts Renewable
    Energy Trust Fund, is not an "institution" of the Commonwealth within
    the meaning of art. 48, The Referendum, Part III, § 2, of the Amendments
    to the Massachusetts Constitution; consequently, that statute is not
    exempted from the referendum process by art. 48. [85-88]
The provisions of § 325 of St. 1997, c. 164, are a nullity and do not effect an
    appropriation; consequently, art. 48, The Referendum, Part III, § 2, of the
    Amendments to the Massachusetts Constitution does not prohibit that
    statute from being the subject of a referendum. [88-89]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on March 24, 1998.

The case was reported by *Ireland*, J.

*Carl Valvo* for the plaintiffs.

*Peter Sacks*, Assistant Attorney General, for Secretary of the
Commonwealth.

*Saul A. Schapiro, Edward Kelly & James A. O'Connor* for
the first ten signers of the referendum petition, amici curiae,
submitted a brief.

LYNCH, J. The plaintiffs, six registered voters of the Commonwealth, seek a declaration that St. 1997, c. 164, is not
subject to the process of art. 48, The Referendum, Part III, § 2,

[1]Five other registered voters of the Commonwealth.

of the Amendments to the Massachusetts Constitution.[2] The action was commenced in the county court, and a single justice reserved decision and reported the case for consideration by the full court. For the reasons set forth below, we conclude that art. 48 does not prohibit St. 1997, c. 164, from being the subject of a referendum.

1. *Chapter 164.* The referendum calls for the repeal of St. 1997, c. 164, entitled "An Act relative to restructuring the electric utility industry in the Commonwealth, regulating the provision of electricity and other services, and promoting enhanced consumer protections therein."[3] Chapter 164 contains numerous provisions both amending existing legislation, and adopting new statutory provisions. St. 1997, c. 164, §§ 1 et seq. Two of these provisions, the plaintiffs contend, insulate the statute from the referendum provisions of art. 48.

The first such provision is § 68. This section amends G. L. c. 40J to create the Massachusetts Renewable Energy Trust Fund which, pursuant to § 37 of c. 164, is sustained by the imposition of a "mandatory charge" on retail electricity consumers. Section 68 (*b*) also authorizes the Massachusetts Technology Park Corporation (corporation) to "draw upon monies in the fund for the public purpose of generating the maximum economic and environmental benefits over time from renewable energy."

The other provision of c. 164, which the plaintiffs contend prevents the statute from being subject to a referendum, is § 325. This section provides, in relevant part: "All monies heretofore appropriated for" the community antenna television (CATV) commission "remaining unexpended on the effective date of [c. 164] are hereby transferred to the department of telecommunications and energy [DTE[4] ] and shall be available for expenditure by said department for the purposes for which such funds were originally appropriated." It is this purported transfer of previously appropriated funds to DTE on which the plaintiffs base their second claim that c. 164 cannot be subjected to the referendum procedure.

---

[2]We acknowledge the amicus brief of the first ten signers of the referendum petition on St. 1997, c. 164.

[3]Chapter 164 was enacted with emergency preamble on November 25, 1997.

[4]Chapter 164 renamed the Department of Public Utilities the "Department of Telecommunications and Energy." See generally St. 1997, c. 164, §§ 2-6.

2. *Article 48.* Part III, The Referendum, § 2, of art. 48, states:

"No law that relates to religion, religious practices or religious institutions; or to the appointment, qualification, tenure, removal or compensation of judges; or to the powers, creation or abolition of courts; or the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth; or *that appropriates money for the current or ordinary expenses of the commonwealth or for any of its departments, boards, commissions or institutions shall be the subject of a referendum petition*" (emphasis supplied).

As we recently stated in *Hurst* v. *State Ballot Comm'n*, 427 Mass. 825, 828 (1998), "Article 48 provides means for the public to participate directly in the lawmaking process, but also safeguards against abuse of those means by special interests to invalidate acts by the people's elected representatives in the Legislature. The State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy."

We have not previously interpreted the provisions of art. 48 that exclude appropriations for the Commonwealth or any of its departments, boards, commissions, or institutions from the referendum process. In so doing, our interpretation of art. 48 must be "the one most consonant with [its] general design and purpose." *Citizens for a Competitive Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 25, 30 (1992), quoting *Brooks* v. *Secretary of the Commonwealth*, 257 Mass. 91, 97 (1926). We have consistently rejected "any restrictive reading of art. 48, as amended, that results in a failure to give effect to the [stated] purpose for which its words were chosen." *Tobias* v. *Secretary of the Commonwealth*, 419 Mass. 665, 674 (1995). We are bound to interpret the words contained in art. 48 in a manner consistent with the general object of the authors. *Id.*, quoting *Henshaw* v. *Foster*, 9 Pick. 312, 317 (1830).

The gravamen of the plaintiffs' action is that §§ 68 and 325 respectively "appropriate[] money for the current or ordinary expenses of the commonwealth or for [one] of its departments, boards, commissions, or institutions." To support this position, the plaintiffs argue that the court should interpret the clause

"boards, commissions, or institutions" of the Commonwealth broadly to include an entity such as the corporation. Although the framers intended to limit the reach of the referendum process so as to exclude appropriations for the "current or ordinary expenses of the Commonwealth," or any of its boards, commissions, or institutions, they did not intend either to bar *all* appropriations or to exclude matters not defined under the clear terms of art. 48. By excluding "any" appropriations for a board, commission, or institution of the Commonwealth from the referendum process, the framers intended to preserve the autonomy of those subsidiary arms of the Commonwealth. 2 Debates in the Constitutional Convention 1917-1918, 782 (1918) (Debates). The framers reasoned that the exclusion was necessary so that the Commonwealth's boards, commissions, departments, and institutions would be better able to provide for future developments which benefit the general welfare of the Commonwealth as a whole. The exclusion of appropriations for such entities from the referendum process affords the Commonwealth the ability to carry out the general business of government. This reasoning, however, does not apply where an appropriation is made to private corporations, to individuals, and, we conclude, to special public corporations created for a particular public purpose. The framers intended the public to have a greater role in reviewing "special legislation" which appropriates funds for such entities. *Id.* at 814-815 (remarks of Mr. Churchill recognizing people's power under the referendum to review legislation which refers to "special and particular individuals, associations or corporations").

The referendum process is intended to give the people of the Commonwealth the means to participate in government so as to enable them to better protect their individual rights. Debates, *supra* at 39. In other words the initiative and referendum furnish a means through which the public "have some say . . . with regard to . . . the laws which shall be enacted." *Id.* It seems clear that special purpose legislation outside the mainstream activities of the Commonwealth is precisely the kind of legislation that the framers thought should be subject to the scrutiny of the voters. Debates, *supra* at 779 (remarks of Messrs. Walker and Luce emphasizing necessity of subjecting certain legislation to review by public).

3. *Sections 37 and 68.* With this background in mind, we address the plaintiffs' first claim that, pursuant to art. 48, the

purported appropriation to the corporation embodied in §§ 37 and 68 bars c. 164 from the referendum process. As art. 48 indicates, the plaintiffs' success on this claim hinges on the statute's making an appropriation[5] to an entity which is both an "institution," within the meaning of art. 48, and sufficiently linked to the Commonwealth such that it may fairly be considered an institution of the Commonwealth, or more specifically, one of *"its . . .* institutions" (emphasis supplied).

The plaintiffs argue that the corporation is an "institution" of the Commonwealth within the meaning of art. 48 because the Legislature created the corporation to promote advanced technological training. General Laws c. 40J, § 1, states that the corporation was created "to establish and operate one or more educational centers containing design, fabrication and testing facilities and equipment for post-secondary academic and practical training programs urgently required to satisfy the education and employment needs of business and industry and the people of the commonwealth." The plaintiffs argue that this statement of purpose demonstrates that an appropriation for the corporation is to an educational institution, such as a State university, which the framers intended to be exempt from the referendum process. Debates, *supra* at 778-780 (remarks of Mr. Luce suggesting term "institutions" include a State university and "agricultural college"). They further assert that the Legislature's designation of the corporation as an "institution" in the enabling legislation renders the corporation an "institution" for the purposes of art. 48. St. 1982, c. 312, § 3.[6] It is unlikely that the constitutional framers would have considered the corporation an "institution" in the sense that they employed the term because the debates make clear that the term refers to insane hospitals or a State university. Debates, *supra* at 778-779 (remarks of Messrs. Luce and Churchill discussing a State university, insane hospitals, and agricultural college during debates concerning scope of limitations on appropriations to "our institutions"). We do not rely on the foregoing, however, because, in any event, the corporation is not sufficiently linked to the Commonwealth

[5]We need not decide whether § 68 makes an appropriation within the meaning of art. 48.

[6]Statute 1982, c. 312, § 3, states: "It is intended that the corporation created pursuant to the provisions of this chapter shall be an educational organization as described in 26 U.S.C. Section 170 (b) (1) (A) (ii) and an institution of higher education as defined in 26 U.S.C. Section 3304 (f)."

that it may fairly be considered one of "its . . . institutions." In *Opinion of the Justices*, 334 Mass. 721, 734 (1956), the Justices opined that money received by the Massachusetts Port Authority, an entity statutorily defined as a "body politic and corporate," was not "money received on account of the commonwealth," for purposes of art. 63, § 1, of the Amendments to the Massachusetts Constitution.[7] Rather, its money was "received on its own account." *Id.* The Justices opined that certain characteristics of the authority "indicate strongly that [it] is not merely a board or commission of the State government." *Id.* Namely, the authority could sue and be sued in its own name, acquire property in its own name, make contracts, and issue bonds which were not to be bonds of the Commonwealth. *Id.* Given these traits, the Justices opined, "the Authority must constitute an entity in itself and must have an existence apart from that of the Commonwealth." *Id.*, citing *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 419 (1943) (deeming housing authority not "the agent or a department of the city of New Bedford" for purposes of G. L. c. 149, § 29, where authority was "suable" and had "contracting powers of a corporation"); *Opinion of the Justices*, 322 Mass. 745, 752-753 (1948) (opining that housing authorities had "a genuine existence of their own which is distinct from the existence of the Commonwealth" where they are suable, have contracting powers, and may own property distinct from Commonwealth).

As a "body politic and corporate," the corporation possesses many of the characteristics the Justices relied on in *Opinion of the Justices*, 334 Mass. 721 (1956). Pursuant to G. L. c. 40J, it may "sue and be sued in its own name," § 4 (*c*); "make contracts and execute all instruments necessary or convenient for the carrying on of its business," § 4 (*d*); and "acquire, own, hold, dispose of and encumber personal or real property of any nature or any interest therein in the exercise of its powers and performance of its duties under this chapter," § 4 (*e*). Moreover, much like the Massachusetts Port Authority, the corporation is nominally placed within an office of the Commonwealth, "but shall not be subject to the supervision or control of said office or of any board, bureau, department or other agency of the

---

[7]Article 63, § 1, of the Amendments to the Massachusetts Constitution provides that all money "received on account of the commonwealth from any source shall be paid into the treasury thereof."

commonwealth." G. L. c. 40J, § 3. See *Opinion of the Justices,*
334 Mass. at 733 (noting that Massachusetts Port Authority was
" 'placed' in the department of public works, but only nominally
so, since it is not to be subject to supervision or regulation in
the ordinary sense").[8] Finally, that G. L. c. 40J, § 3, labels the
corporation a "public instrumentality of the commonwealth"
whose work is "held to be an essential governmental function"
does not alter our conclusion. See *Opinion of the Justices,* 334
Mass. at 733 (noting that Massachusetts Port Authority's
enabling act labeled it " 'a public instrumentality,' and the
exercise of its powers 'shall be deemed and held to be the
performance of an essential governmental function' "). See
*Commonwealth* v. *Toomey,* 350 Mass. 345, 347, 349 (1966)
(concluding that placement of Massachusetts Turnpike Author-
ity in Department of Public Works was irrelevant for purposes
of determining whether Authority was "state department or
commission" under G. L. c. 268, § 10); *Opinion of the Justices,*
271 Mass. 582, 594 (1930) (State motor vehicle insurance fund
did not establish new department of Commonwealth in
contravention of former art. 66 of the Amendments to the Mas-
sachusetts Constitution in part because "the Commonwealth has
no responsibility for [its] management"). Therefore, the corpora-
tion is a body whose identity is sufficiently distinct from that of
the Commonwealth that it cannot fairly be deemed one of "its
. . . institutions" whose appropriations are exempted from the
referendum process by art. 48.[9]

4. *Section 325.* The plaintiffs' second claim based on § 325
is equally unavailing. Although DTE is a department of the
Commonwealth, § 325 does not "appropriate" funds to DTE.
To appropriate is "to set apart from the public revenue a certain
sum of money for a specified object, in such a manner that the
executive officers of the government are authorized to use that
money, and no more, for that object and for no other." *Slama* v.
*Attorney Gen.,* 384 Mass. 620, 625 (1981), quoting *Opinion of
the Justices,* 323 Mass. 764, 766 (1948). Section 325 was

[8]"Until 1966, art. 66 of the amendments to the Massachusetts Constitution
required that 'every executive and administrative office, board and commis-
sion' be placed in one of the twenty departments into which the Executive
Branch of the government was to be organized. In 1966, however, this article
was annulled by art. 87 of the Amendments." *Opinion of the Justices,* 368
Mass. 880, 887 (1975).

[9]We have noted in another context that the distinguishing features of bodies
politic and corporate include financial and political independence. *Lafayette
Place Assocs.* v. *Boston Redevelopment Auth.,* 427 Mass. 509, 528-530 (1998).

enacted in November of 1997. Any funds appropriated for the CATV Commission remaining unexpended at the end of June, 1997, reverted to the Commonwealth. See G. L. c. 29, § 13. The appropriations act for fiscal year 1998, St. 1997, c. 43, § 111, abolished the CATV *Commission* and replaced it with the CATV *Division.* It then appropriated funds directly to the CATV *Division.* Any funds appropriated for fiscal year 1998 were expressly earmarked for the Division, and not the Commission. Even if the ambiguous language in the fiscal year 1998 budget that "the community antenna television divisions shall be assessed at $720,000 for fiscal year 1998 pursuant to section 2 of chapter 166A" constitutes an appropriation, it would be an appropriation to the *Division.* St. 1997, c. 43, § 2. As of November, 1997, there were no funds in the coffers of the now-defunct Commission, and the questionable assessment language does not change that fact. Section 325, therefore, does not itself effect an appropriation because it is a nullity, since no funds previously appropriated for the CATV Commission remained unexpended on the effective date of c. 164.

We remand the case to the county court for the entry of a judgment declaring that art. 48 does not prohibit St. 1997, c. 164, from being the subject of a referendum.

*So ordered.*