Whitehead, J.
By way of introduction, I note that the plaintiff, Foss Manufacturing Company, Incorporated, brought this action against the defendant, Mal-den Mills Industries, Incorporated, alleging breach of contract, promissory estoppel, and violation of General Laws Chapter 93A. The case was tried before the Court on May 5, 1999 through May 7, 1999. The following constitute the Court’s findings of fact, rulings of law and order for judgment after trial.
FINDINGS OF FACT
Foss Manufacturing Company, Incorporated, is a corporation engaged in the manufacture of synthetic *505 fibers and non-woven textiles. It employs approximately 600 people and has a principal manufacturing facility in Hampton, New Hampshire. Malden Mills Industries, Incorporated, is a corporation also engaged in the manufacture of textiles. It has a principal manufacturing facility in Lawrence, Massachusetts.
On December 11, 1995, a fire destroyed three buildings at the Malden Mills facility in Lawrence. The buildings housed, among other things, the company’s Flock Division, which manufactured printed flock products. The buildings also housed other manufacturing processes.
The fire at Malden Mills was the subject of extensive coverage in the news media. That coverage gave the impression that the impairment of Malden Mills’ manufacturing capability was even greater than was the case. Malden Mills’ management, headed by its president and chief executive officer, Aaron Feuerstein, believed that it was important to reassure the public, and particularly Malden Mills’ employees and customers, that it remained an ongoing concern. It was also important to avoid remaining out of the flock market for an extended period of time. Accordingly, management undertook action immediately after the fire to secure a new facility in which to locate the operations affected by the fire.
In that regard, Foss Manufacturing Company owned a 152,000-square foot building which was located at 231 Neck Road, in Haverhill. The building was essentially vacant. Foss had moved its Haverhill operations to Hampton in 1992. All that remained in the building in Haverhill was some obsolete equipment and product that Foss was keeping in storage. These items occupied approximately 50,000 square feet. Foss only kept them there because the space was free.
In mid-1995, Foss had placed the Haverhill building up for sale and was marketing the property through a brokerage known as The Thomas Group. The Thomas Group’s representative with which Foss dealt was Thomas Bachini. In late fall 1995, approximately four prospective purchasers were talking with Foss about the possibility of buying the Haverhill property.
Immediately after the fire, Mr. Bachini, at the direction of Stephen Foss, the President of Foss Manufacturing Company, notified Jeffrey Weise, Purchasing Director of Malden Mills, of the availability of Foss’s Haverhill property.
In late December 1995, Mr. Feuerstein, Mr. Weise and a Mr. Naor, who was the manager of the Flock Production Division of Malden Mills, toured the Haver-hill facility in the company of Mr. Bachini and Mr. Foss. During that tour, representatives of Malden Mills stated that the new site for operations required four things: first, 300 linear feet of space; second, steam; third, gas; and, fourth, a significant amount of electrical power. All of those items were present at the Haverhill facility.
The parties discussed the fact that certain electrical transformers at the Haverhill building might have to be moved to make room for the flocking operation. Mr. Foss noted that that movement could be done, although with some complications, and, when being done, it was a good time to change oil which they contained, because the oil had a product in it which contained PCBs. PCBs are now deemed hazardous materials. Mr. Foss stated that the cost of the oil change would be approximately $30,000. No representative of Malden Mills expressed concern at the presence of the PCBs or at the cost of the oil change.
After the tour, Mr. Naor, the Flock Production Manager, advised Mr. Feuerstein that the Haverhill building was indeed suitable to accomplish Malden Mills’ goal of getting back into production and into the market as quickly as possible.
Contemporaneously with the consideration of the Haverhill site, representatives of Malden Mills were considering other sites. By January 1996, Mr. Feuerst-ein had focused his interest on the Haverhill site. However, within a couple of days of January 1996, his engineering staff told him that the use of the facility involved several million dollars of additional costs, and he deferred a decision on making an offer. Mr. Weise spoke with Mr. Bachini and kept him abreast of Mr. Feuerstein’s thinking during this time period.
On January 25, 1996, Mr. Weise faxed Mr. Bachini a memorandum stating that another acquisition that Malden Mills had been contemplating had fallen through on the previous evening. He stated that Mal-den needed the Haverhill property and wanted to buy it at the price of 2.7 million dollars. He specifically stated that he wanted to, as he put it, “put the deal to bed.”
Still on January 25, 1996, Mr. Feuerstein, on behalf of Malden Mills, signed a memorandum of purchase which had been prepared by The Thomas Group. It was similar to what is commonly referred to as an offer form and comprises Exhibit 2 in this case.
Later on January 25, 1996, Kevin Sexton, a board member, vice president and chief financial officer of Foss, at the direction of Stephen Foss, signed the memorandum of purchase on behalf of Foss. Before he did so, he inserted and initialed the words “as is" after the description of the premises. On January 26, 1996, Mr Weise faxed Mr. Bachini a memorandum agreeing to the insertion of the “as is” term.
Shortly after execution of the memorandum of purchase, news reports of the purchase began to appear. From the evidence that I’ve heard, I cannot determine the original source of those news reports. However, representatives of Malden Mills did confirm either explicitly or implicitly to the news media that a preliminary agreement, at least, had been reached relative to the purchase of the facility.
*506 After execution of the memorandum of purchase, Foss Manufacturing immediately began to take steps to sell the obsolete inventory and product that was located at the Haverhill facility. In that regard, it called brokers, in order to arrange an expedited sale of those items. Foss also called the prospective buyers of the facility and told them that the facility had been sold.
From the other end, Mr. Feuerstein directed his engineering staff to do a study to confirm that the Haverhill facility was indeed suited to Malden Mills’ needs to get into production into the market as quickly as possible.
On January 29, 1996, Kathleen Potter, an in-house staff attorney for Malden Mills, forwarded to John Ryan, outside counsel for Foss, a draft of a proposed purchase and sale agreement, which is now attached to Exhibit 4 in this case. On January 31, 1996, Mr. Ryan faxed to Ms. Potter his response, which now comprises Exhibit 18 in this case. The two exchanged phone calls at some point and, on February 7, 1996, they talked about the proposed purchase and sale agreement and the changes suggested by Mr. Ryan. They reached agreement on all terms except for Foss’s proposal that Malden Mills expressly assume all responsibilities for the PCBs in the transformers and remediate those PCBs as required by governmental regulation, and hold Foss harmless from any claims arising out of the existence or remediation of the PCBS. Ms. Potter stated, with respect to that proposal, that she had to speak to her client.
The Court finds that that proposal was not a deal-breaker. Foss was not insistent upon it. It was willing to withdraw it in the course of further negotiations. The existence of the PCBs in the oil of transformers of that vintage was not unusual. It did not create an unusual problem for the building owner under General Laws Chapter 2IE.
Although, by the terms of the memorandum of purchase, the parties were to agree on a purchase and sale agreement within one week, I conclude that both parties waived the one-week deadline when both continued with active negotiations after February 2, 1996, the one-week deadline, and when they, in speaking, never spoke of the need to reach an agreement within any particular time frame. Indeed, the timing of the signing of the purchase and sale agreement was not important so long as an agreement ultimately was reached and the closing occurred before April 1, 1996.
Between February 7 and February 14, 1996, it appears that no significant communications occurred between Malden Mills and Foss. On February 14, 1996, Mr. Weise faxed to Mr. Bachini a memorandum stating, in effect, that Malden’s counsel was concerned with Foss’s request about Malden’s assumption of liability for the 21E issues, meaning the issues relating to the transformers. The memorandum did not convey the sense that the 21E issues were a major problem.
On the same day, Mr. Weise spoke to Mr. Sexton, of Foss, who inquired as to the status of the purchase and sale agreement. He stated that he and Mr. Foss were going on vacation on the following day and would not be back until February 26. Mr. Weise told Mr. Sexton that the purchase and sale agreement was just buried in Ms. Potter’s papers and implied that it would be reached in due course. He did not mention that there were any problems and, in particular, he did not mention that the 2IE issue was a problem.
Still later on February 14, 1996, Mr. Bachini sent a fax to Mr. Weise stating that Mr. Sexton was unaware of the 21E problem, that he was going on vacation and that he wished to enter into a purchase and sale agreement as quickly as possible. Mr. Weise did not forward any return communication indicating that the 21E issue was a problem.
In fact, in his own words, Mr. Weise was “stalling” Foss Manufacturing Company. Malden’s engineers had been doing a comparative study of the relative • benefits of buying the Haverhill facility, on the one hand, and buying a building owned by an entity named Loomweve, in Lawrence, on the other hand. There was a conflict between the production manager of Malden Mills, on the one hand, and its engineer, on the other hand, as to the utility of the Haverhill facility. Malden wanted to resolve the conflict before proceeding further with the deal.
By way of a memorandum faxed on February 20, 1996, Mr. Weise advised Mr. Bachini that Malden was having second thoughts about the deal. In that regard, he was referring to the concerns that Malden’s engineer had that the Haverhill facility might not be suitable to getting on line as quickly as possible.
On February 26, 1996, Mr. Sexton returned from vacation and learned of Malden’s hesitation. He called Mr. Weise and expressed outrage that Malden might back out of the deal. He stated that he felt that the parties had a contract. Mr. Weise did not disagree. Instead, he replied that Mr. Sexton’s concerns were premature, that Malden still might take the property and that he would get back to Mr. Sexton.
Within the next two or three days, on or about February 27, 28 or 29 of 1996, Mr. Feuerstein decided not to buy the Haverhill property. He did so because Stone & Webster, engineers with whom Malden had contracted to do an independent review as to the utility of the Haverhill facility, concluded that the Haverhill facility could not be rehabilitated in time to get Malden back on line for prompt production of flock. Stone & Webster actually said the same thing about Loomweve; however, Malden bought the Loomweve property sometime in February or March of 1996.
On March 1, 1996, Mr. Feuerstein called Mr. Foss, who was in Florida, and informed him of Malden’s decision not to buy the Haverhill property. He stated that he was sorry for the “hell” that he had put Foss Manufacturing through. Mr. Foss replied that Malden *507 had significantly damaged his company. Mr. Feuerst-ein stated that that was for the courts to decide.
I find that on March 1, 1996, Foss Manufacturing was ready, willing and able to sell the Haverhill property on the terms listed in the memorandum of purchase. I find without any doubt at all that Malden declined to enter into a purchase and sale agreement and close the deal for one reason and one reason only: it was not economical for the company to buy the facility.
I also find that time was of the essence with respect to entry into the purchase and sale agreement only to the extent that the purchase and sale and closing had to occur by April 1, 1996. Thus, the failure to have agreement on a purchase and sale agreement by February 2, 1996 was not a factor in the decision not to buy the properly.
I also find that the fact that the purchase and sale agreement was not arrived at had nothing to do with Foss’s proposal concerning the assumption of 21E liability as regards the transformers.' That was an issue which was not insurmountable.
Once again, I find Malden failed to sign and close simply because it did not want to close: it was not economically sound for Malden to do that.
In defense of Malden, if you will, I find that when Malden first signed the memorandum of purchase it did so because it actually wanted the building and for no other reason. It had to move quickly and it made a hasiy decision. I find that it did not enter into the agreement disingenuously, for the sole purpose of obtaining public recognition of its desire to continue and without any real intention to purchase the property.
I also find that Malden did not repudiate the agreement in order to gain any financial advantage over Foss or anyone else. Once again, its decision to purchase was driven by the economics of the purchase, and its decision to repudiate was driven by a change in its perception of those economics.
I further find that at the time Malden repudiated the memorandum of purchase Mr. Feuerstein, on a subjective level, believed that he had at least an argument that the memorandum was not enforceable because it followed the format of what is commonly referred to as an “offer form,” and because it contained language which might arguably suggest that it was tentative in nature.
I note that McCarthy v. Tobin had not been decided by the Supreme Judicial Court at that time, and there was confusion even among members of the bar as to exactly when an offer to purchase becomes a binding agreement.
After Malden’s repudiation of the contract, Foss immediately sought to market the property again. On March 12, 1996, it entered into a second memorandum of purchase with Joseph Scott. That memorandum of purchase is Exhibit 19 in this case. The purchase price, once again, was 2.7 million dollars. A purchase and sale agreement was to be reached within 30 days, and a closing was to be had within 180 days after the purchase and sale agreement was signed.
I find that the long closing date was needed for Scott to arrange financing. Financing apparently was a problem for Mr. Scott.
I find that, in the circumstances, the deal which Foss entered into with Scott constituted a reasonable effort to mitigate its damages resulting from what it asserts was the breach of contract by Malden Mills.
During the period when the closing with Scott was pending, Foss allowed Scott to lease part of the premises, provided that the proceeds of the leases be forwarded to Foss at the closing. Also during the pendency of the closing, Foss continued to keep some of its obsolete equipment and product on the premises, occupying at first, in April of 1996, approximately 50.000 square feet, and by October of 1996, occupying 30.000 square feet. The closing between Foss and Scott occurred on October 31, 1996. At that timé, lease proceeds in the amount of $38,634.94 were remitted by Scott to Foss.
I find that during the seven months between April 1, 1996, when the Malden closing would have occurred, and October 31, 1996, when the Scott closing would have occurred, Foss incurred the following costs in carrying the Haverhill building: $90,911.25 consisting of interest on its 1.8 million dollar mortgage on the premises; real estate taxes in the amount of $42,308.31; electric bills in the amount of $16,465.17; gas bills in the amount of $5,044.49; trash bills in the amount of $3,326.66; water bills in the amount of $1,340.45; insurance premiums in the amount of $23,331; the cost of hiring security personnel, consisting of a Mr. Brown, whose pay during the period was $25,089.37, a Mr. Smulski, whose pay during the period was $15,049.22, a Mr. Dagnault, whose pay during the period was $17,123.35. I find that in addition Foss incurred costs equal to roughly 33 percent of the total pay earned by those employees during the period for employee benefits, so that the total employee expenses were $76,158.38. Accordingly, the total carrying costs on the building were $258,885.70.
I also find that Foss sustained losses consisting of loss of use in equity in the facility. The net equity that it had in the facility was approximately $791,828.95. And I do find that, on balance, the rate of return that Foss could have secured had it invested that sum would have been twelve percent. I would note that even in that era, certainly now, but even in that era, it would be difficult to obtain twelve percent in a simple interest-bearing account. On the other hand, if the money was invested in the equities market or perhaps in the Foss business — Mr. Foss testified that the rate of return justified a twelve percent rate, and I accept *508 that — the money would have earned twelve percent or more. So, on balance, I find that the twelve percent figure is appropriate. So, calculating a twelve percent loss of use rate on a net equity of $791,828.95, I find the loss of use amounts to $55,428.03.
Lastly, I find that Foss had to undertake repairs to the roof of the building during the seven-month period; that those repairs cost $35,000. As I recall, they were actually performed by Scott and a credit was given to him in that amount. But that was the actual cost to-Foss.
So the total gross damages sustained by Foss, in terms of carrying costs, loss of equity and repairs to the roof amounted to $349,313.73. Against that, I deduct the amount of the rents which were forwarded by Scott at the time of the closing, consisting of $38,634.94.
An argument can be made that some further deduction should be made for the rental value of the premises to Foss during the period it stored what has been described as obsolete equipment and product on the premises. It is difficult for me to come up with any particular figure in that regard. Looking at the leases that were extended to tenants of Scott during the period, it would appear that perhaps an expense of nine or ten thousand dollars a month would be an appropriate amount to charge for that space. However, I am inferring that the space that Mr. Scott was leasing was finished space and I’m also inferring that the space in which the obsolete product and equipment was stored was not, so it would have significantly less value. It would appear that the storage of the equipment resulted in no cost to Scott and no real benefit to Foss Manufacturing because it had another place to store the equipment and product. Accordingly, I am not going to assign any value to that rental. So I deduct only the amount of $38,634.94 from the gross carrying costs, loss of equity and repairs to the roof, for a net total of $310,678.79.
RULINGS OF LAW
I do rule that the memorandum of purchase on January 25, 1996 was a binding agreement. As the Supreme Judicial Court noted in McCarthy v. Tobin, 428 Mass. 84, at 87, a recent case, a 1999 case, a controlling fact is the intention of the parties. In seeking to ascertain the intention of the parties, we start with the document itself. If the intention of the parties can be adequately determined from looking at the document itself, we go no further. If there is an ambiguity, we look to evidence outside of the document to clarify the ambiguity and to further define the intent of the parties.
With respect to the document itself, the memorandum shows agreement as to all of the material terms. It describes the buyer, the seller, the premises to be sold, the price, circumstances of financing, closing date, assignment of brokerage commission, and states contingencies which, in my view, are essentially ministerial in nature.
The Appeals court has stated “If the parties have agreed upon all material terms, it maybe inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding one.’’ And the citation to that is Goren v. Royal Investments, Incorporated, 25 Mass.App. 137, at 140, a 1987 case.
Similarly, the Supreme Judicial Court said in Coan v. Holbrook at 327 Mass. 221, specifically at Page 224, a 1951 case, “Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof.”
Further supporting the conclusion that all material terms were agreed upon and that the signing of a purchase and sale agreement was merely a ministerial . event is the fact that the date for signing the purchase and sale agreement was only a week after the signing of a memorandum of purchase. I infer that so little time was needed not only because Mr. Feuerstein wanted to act quickly, but because there was nothing to talk about other than routine details.
There is a portion of the document which arguably creates ambiguity, and it is this sentence: “This offer is subject to final commitment in the form of a purchase and sale agreement fully executed, acceptable to both buyer and seller and their attorneys.” If one were to parse extensively the terms “final commitment,” one could make arguments that they suggest that the document was not binding. If one focuses on “commitment” and notes that the parties were contemplating a “commitment” at a later date, one might infer that there was no “commitment” here. On the other hand, if one looks at the word “final,” one might infer that they already had a “commitment” here and that the “commitment” later on was just a reaffirmation of the “commitment” contained in the memorandum of purchase.
In my view, such parsing is not necessary. There is not an ambiguity. This language is very similar to language in other offers to purchase which has not been deemed fatal to the finding of a binding agreement from an examination of the face of the agreement alone. I believe that a reasonable reading of that language leads to the conclusion that the parties contemplated that there would be a purchase and sale agreement which would tie off ministerial loose ends but that the parties were otherwise bound.
If there were an ambiguity and if we were to look at parol evidence, it is my view that the Court would still arrive at the conclusion that a binding agreement was contemplated.
Looking at the extrinsic facts, Mr. Feuerstein needed a building quickly. He had seen the Haverhill *509 building and he had been told by his production manager that it fit his needs. At the time that the memorandum of purchase was signed, this appears to have been his only alternative. He had had a deal fall through on the previous evening, as Mr. Weise had indicated in the memorandum. In the circumstances, it is reasonable to infer that Mr. Feuerstein wanted to lock in his right to purchase the property. The memorandum from Mr. Weise to Mr. Bachini on January 25, in which he said that Malden needed the building and wanted it and that he “wanted to put it to bed” all, in my view, compel the conclusion that a binding agreement was contemplated.
I note farther that when repudiation of the agreement was in the offing, both Mr. Weise and Mr. Feuerstein were told by Mr. Sexton and Mr. Foss, respectively, that Foss Manufacturing believed that the agreement was binding, and neither of them challenged that assertion.
It is true that Mr. Feuerstein expressed in court the subjective belief that the agreement was not binding, but the case law makes it clear that we do not look to later expressions of unspoken subjective belief in determining the intent of the parties; we look objectively to their actions and words at the time of the agreement. And, when I look at the actions and words of the parties and the circumstances in which those actions and words were taken or spoken, I do conclude, again, that the intention of the parties, as a matter of law, was to have a binding agreement.
In the view of the Court, a deal had been struck on January 25, 1996, for Malden Mills to purchase the property on April 1, 1996 for 2.7 million dollars in a cash deal subject only to the ministerial contingencies stated in the agreement.
Foss being ready, willing and able to comply with the agreement, Malden breached the agreement. As I have indicated, to the extent that Malden cites the failure to obtain a purchase and sale agreement within the one-week time frame, the deadline was waived, and the total failure to reach that purchase and sale agreement was due to the unjustified refusal of Malden Mills to negotiate after February 7, 1996.
To the extent that the agreement may not have been binding and did not necessarily lock Malden and Foss into a purchase and sale on April 1, 1996, I do agree with Foss’s contention that, at a minimum, it required Malden and Foss to negotiate in good faith to reach a purchase and sale agreement consistent with the terms of the memorandum of purchase.
Although case law in that regard is sparse, I do note that in those cases where the Court has found an offer to purchase not to create a binding contract and has ultimately excused one party or the other from performance, the parties had gone on and had negotiated and had in good faith reached an impasse as to the terms. I know of no case which has held that a party can walk away from a signed memorandum of purchase similar to this one for no reason at all. If that were the case then such memoranda would have no utility at all. The parties might as well not sign them and just move directly to the purchase and sale agreement. If they have any utility at all, they must be deemed to impose upon the parties a duty to negotiate in good faith. And, as I indicated, although Malden appeared to have negotiated in good faith up until February 7 of 1996, it stopped negotiating altogether after that and did not fulfill its obligations under the memorandum of purchase, even if it was not a binding contract.
With respect to damages for the breach of contract, the damages are as I have indicated. In my view, the fact that the sale price to Scott was the same as the would-be sale price to Malden does not mean that Foss has not sustained damages. The role of damages is to place a party in as good a position as it would have been in had the other party not breached; and to place Foss in the position that it would have been in had Malden gone through with the contract to purchase, Foss ought to be able to recover the carrying costs, loss of equity and repairs as I have indicated.
With respect to the claim for promissory estoppel, in my view, it is redundant of the breach of contract claim, once the Court has found a breach of contract, so I do not take it up.
Lastly, with respect to the claim under Chapter 93A, Section 11, the law of the Commonwealth is that a breach of contract standing alone does not amount to a Chapter 93A violation. That is articulated in, among other cases, Anthony’s Pier Four, Incorporated v. HBC Associates, at 411 Mass. 451, a 1991 case. Rather, to rise to the level of a Chapter 93A violation, a breach of contract must involve conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching pariy. Again, the Pier Four case at Page 474. See also Ahearn v. Scholz, 85 F.3d 774, at 798, a First Circuit 1996 case.
Further, the objectionable conduct must attain “a level of rascality that would raise an eyebrow of someone enured to the rough and tumble of the world of commerce.” The cite to that quotation is Levings v. Forbes & Wallace, Incorporated, 8 Mass.App. 498, at 504, a 1979 case.
In my view, the actions of Malden do not meet these criteria for a Chapter 93A violation. There was a breach of contract. In my view, there is no question about that. But that’s all there was. I do not find that, as I have already indicated, Malden signed the memorandum of purchase solely for the purpose of getting good publicity and without any intent to follow through. I find, as I have indicated, that it signed the memorandum of purchase with the intention of buying the building.
*510 It ultimately breached its obligation for economic reasons and economic reasons alone. It did not attempt to secure any advantage against Mr. Foss or against anyone else.
It is arguable, even, that it was not certain that it had a contractual obligation to go through with the agreement, at least at a subjective level. As I have indicated, Mr. Feuerstein — and I do accept his testimony on this point — had the subjective view that an offer form is an offer form and is not binding. That is a myth, but it is one that has existed for many years, even after Goren. Now that we have McCarthy v. Tobin, it may be clearer.
So I cannot find that there was a breach of a contract involving a disregard of known contractual arrangements and intended to secure benefits for the breaching party. And, even if that were the case, I do not find that there was any conduct by way of the breach which attained “a level of rascality that would raise an eyebrow of someone enured to the rough and tumble of the world of commerce.” What happened here is, in my view, Malden made a business decision, plain and simple, without any intention to cause any undue disadvantage to anybody or to gain any undue advantage for itself.
It is true that, particularly during the period February 7 to at least February 20, and perhaps February 27, 28 or 29, Malden, acting through Mr. Weise, dissembled and gave the impression that it certainly was going to buy the property at a time when it did not know whether it was going to go through the deal or not. I do not find that, in itself, so offensive as to constitute a 93A violation; and even if it were a 93A violation, I do not see any harm that has been suffered by Foss as a result of such conduct, and, under Section 11, there must be a showing of harm for there to be recovery under 93A.
I cannot see that Foss would have done anything different. As far as it thought, it was bound. It was not going to go out and market the property to someone else even if it knew that Malden was having second thoughts. And that is all I find that Malden was having at that point: was second thoughts. It just did not know whether it was going to accept the property or not during that period.
So, again, on balance, I find that there was no violation of General Laws, Chapter 93A. There was no “unfair or deceptive practice” as that term is used in Chapter 93A, Section 11.
ORDER FOR JUDGMENT
With respect to an order for judgment, having found for the plaintiff on Count 1,1 order that judgment enter for the plaintiff on Count 1 in the amount of $310,678.79 plus the usual interest and costs. I dismiss Count 2 because, as I say, it is redundant of Count 1 given my finding on Count 1. And I find for the defendant on Count 3.